# EXHIBIT 3

Page 1

1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF FLORIDA
3              FORT LAUDERDALE DIVISION
4
5           CASE NO. 0:12-CV-61826-WJZ
6   MATTHEW BENZION and          )
7   THEODORE GLASER,             )
8   individually and on          )
9   behalf of others             )
10  similarly situated,          )
11              Plaintiffs,      )
12      -vs-                     )
13  VIVANT, INC., a Utah         )
14  corporation,                 )
15              Defendant.       )
16      The deposition of ANYA VERKHOVSKAYA, called
17  for examination, taken pursuant to the Federal
18  Rules of Civil Procedure of the United States
19  District Courts pertaining to the taking of
20  depositions, taken before NANCY A. GUIDOLIN, CSR
21  No. 84-2531, a Notary Public within and for the
22  County of DuPage, State of Illinois, and a
23  Certified Shorthand Reporter of said state, at
24  Suite 4100, 111 South Wacker Drive, Chicago,

Page 2

1   Illinois, on the 19th day of November, 2013,
2   commencing at 11:00 a.m.
3
4   PRESENT:
5       BRODERICK LAW, P.C.,
6       (125 Summer Street, Suite 1030,
7       Boston, Massachusetts 02110,
8       617-738-7080), by:
9       MR. EDWARD A. BRODERICK,
10      ted@broderick-law.com,
11          appeared on behalf of the Plaintiffs;
12
13      LOCKE LORD LLP,
14      (111 South Wacker Drive, Suite 4100,
15      Chicago, Illinois 60606,
16      312-443-0610), by:
17      MR. THOMAS J. CUNNINGHAM,
18      tcunningham@lockelord.com,
19      MR. MARTIN W. JASZCZUK,
20      mjaszczuk@lockelord.com,
21          appeared on behalf of the Defendant.
22
23  REPORTED BY:  NANCY A. GUIDOLIN, C.S.R.,
24          CERTIFICATE NO. 84-2531.

Page 3

1       (WHEREUPON, the witness was duly
2       sworn.)
3           ANYA VERKHOVSKAYA,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6           EXAMINATION
7   BY MR. CUNNINGHAM:
8       Q.   Good morning, Ms. Verkhovskaya.  The
9   first question is:  Am I pronouncing your name
10  correctly?
11      A.   Close.
12      Q.   How do you pronounce it?
13      A.   Verkhovskaya.
14      Q.   I am going to work on that today.  I'm
15  going to try.  Could you please state and spell
16  your last name for the record?
17      A.   Absolutely.  It's V, as in victory,
18  e-r-k-h-o-v-s-k-a-y-a.
19      MR. CUNNINGHAM:  This is the deposition of
20  Anya Verkhovskaya, being taken pursuant to the
21  Federal Rules of Civil Procedure, Notice, and at
22  this date, time and location by agreement of the
23  parties.
24  BY MR. CUNNINGHAM:

Page 4

1       Q.   Ms. Verkhovskaya, I understand that you
2   are acting as an expert witness in this case, and
3   that you have testified at depositions before; is
4   that correct?
5       A.   That is correct.
6       Q.   So because you have been to depositions
7   before, I'm sure that you know how depositions work
8   and what the rules are, but, very briefly, just to
9   make sure that we get it on the record and refresh
10  both you and me on how to behave at a deposition,
11  remember that you have to answer questions out loud
12  so the court reporter can take down your answers.
13          I'm going to try very hard not to talk
14  over you today.  I'll wait until you finish
15  speaking before I begin asking my next question,
16  and I'd ask that you wait before I finish asking a
17  question before you start to answer it.  Okay?
18      A.   Okay.
19      Q.   If you don't understand any question
20  that I ask you today, please let me know so that I
21  can clarify it or ask a different question so that
22  you do understand it.  Okay?
23      A.   Okay.
24      Q.   Let's begin with the subpoena.  I'm not



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
5–8

Page 5

1  going to mark this as an exhibit, but I will hand
2  you a copy of the subpoena that was issued for your
3  deposition in this case.  Did you receive this
4  document?
5      A.  Yes, I did.
6      Q.  And did you review it when you received
7  it?
8      A.  Yes, I did.
9      Q.  Did you bring any documents with you
10  today?
11     A.  Not with me today.
12     Q.  Okay.  Set that aside.
13         I understand that you have been retained
14  by the plaintiffs in this lawsuit.  Can you tell me
15  what you were asked to do in connection with this
16  lawsuit?
17     A.  Data analysis.
18     Q.  Okay.  And what type of data analysis?
19     A.  We received a list of phone numbers, and
20  we were asked to perform a number of steps that are
21  outlined in the Affidavit that I provided.
22     Q.  Okay.  After you took those steps, did
23  you form any opinions in relation to this case?
24     A.  No.  We provided results of the analysis

Page 6

1  as outlined in the Affidavit.
2      Q.  And in performing your work, your
3  analysis, did you use a computer program or system?
4      A.  That's correct.
5      Q.  What computer program or system did you
6  use?
7      A.  We used several proprietary systems
8  developed for this line of work.  In addition, we
9  used several Microsoft Suite programs for
10  communication and reporting.
11     Q.  Let's eliminate the Microsoft products
12  first, because those are probably easy.  What
13  Microsoft products are you talking about?
14     A.  Word, Excel, Outlook.
15     Q.  Now, the proprietary systems that you
16  mentioned, are those -- when you say,
17  "proprietary," are those systems that are available
18  only to your company?
19     A.  Correct.
20     Q.  What is the name of your company?
21     A.  A.B. Data.
22     Q.  And how did you use those programs?
23     A.  We used those programs to analyze the
24  data and to produce reports necessary for

Page 7

1  production of our Affidavit.
2      Q.  Okay.  And when you say that they are
3  proprietary, does that mean that they are available
4  only to you and your company, or are they available
5  for other people to purchase and use?
6      A.  Only to A.B. Data.  They were developed
7  in house for the use in supporting TCPA data
8  analysis.
9      Q.  Okay.  And does this system -- or do
10  these -- first of all, I guess, is it one system or
11  more than one system?
12     A.  It's several systems that -- it's
13  relational databases.  They talk to each other.
14     Q.  Now, is the system that maintains the
15  database proprietary to A.B. Data, or is it just
16  the data that's in the database that's proprietary?
17     A.  The system itself is proprietary.  It
18  contains only data that we receive from either
19  plaintiffs or defense counsel in combination with
20  whatever other data that gets appended to the
21  source data.
22     Q.  Okay.  Does it have a name?
23     A.  It has a name.  It's called CAAD, Class
24  Action Administration Database.

Page 8

1      Q.  Class Action Administration Database.
2      A.  Or sometimes it's also referred to as
3  Records Database.
4      Q.  Okay.  Now, you spoke about reviewing a
5  list of phone numbers.  Did you check the data that
6  you received to eliminate duplicate records?
7      A.  Yes.
8      Q.  How did you do that?
9      A.  We looked at the list of phone numbers.
10  Then with the use of our proprietary database we
11  standardized that list to make sure that if there
12  were different formatting, like dashes versus
13  parenthesis, extra spaces, all of the phone numbers
14  were standardized to be in the same format.
15         We checked that all of the phone numbers
16  were complete and didn't have missing or extra
17  numbers, and then we de-duplicated the list based
18  on the phone numbers.
19     Q.  Okay.  When you say you de-duplicated,
20  was the de-duplication performed within the
21  proprietary database, or was that de-duplication
22  performed outside of the proprietary database?
23     A.  It was in.
24     Q.  Did you find many phone numbers that



Page 9

1  were either incomplete or missing numbers or --
2     A.   I don't believe so.  I do not have that
3  information with me today, but I believe that there
4  weren't any or very few.
5     Q.   That system is able to output a report.
6  So if you wanted to know the answer to that
7  question, you could go into that system and ask it
8  to generate how many numbers were incomplete or had
9  an extra digit or something like that?
10    A.   That's correct.
11    Q.   Did you make any changes to the data
12 that you received?
13    A.   At what time?  At what point?
14    Q.   At any point in your work.
15    A.   Yes.
16    Q.   We will start broad.
17    A.   Yes.
18    Q.   Okay.
19    A.   Yes.  Well, we did not touch the source
20 data.  The source data was always the source data.
21    Q.   Okay.
22    A.   But then we de-duplicated the records,
23 and then we appended some additional information to
24 the records.

Page 10

1     Q.   Okay.  What additional information did
2  you append after you de-duplicated?
3     A.   We appended an identifier, whether a
4  phone number or a cellular phone number, a mobile
5  phone number.
6     Q.   Anything else?
7     A.   Yes.
8     Q.   What else?
9     A.   And whether that phone number was on the
10 do-not-call list, and the time, the date when -- if
11 available, when that number was registered on the
12 do-not-call list, or also referred to as DNC
13 Registry.
14    Q.   And how did you determine whether a
15 particular phone number was a cell phone number or
16 a landline?
17    A.   We work with several third-party
18 providers that have databases with that
19 information, and we utilize their information.
20    Q.   Who are those providers?
21    A.   There are several.  LexisNexis is one,
22 NEXXA.  There are half a dozen different providers
23 that are used by the class action and data
24 administration industry.

Page 11

1     Q.   Okay.  Any others?
2     A.   I don't believe so.
3     Q.   Okay.  Did you use both LexisNexis and
4  NEXXA -- and I believe NEXXA is N-E-X-X-A; is that
5  correct?
6     A.   Correct.
7     Q.   Okay.  Did you use both LexisNexis and
8  NEXXA to determine whether phone numbers were cell
9  phone numbers or landlines?  Or did you only use
10 one or the other?
11    A.   Well, we only used NEXXA in this
12 particular case.
13    Q.   And then to check whether a number was
14 on the DNC list, and, if so, the date and time the
15 number was registered on the DNC list, how did you
16 do that?
17    A.   That information was appended through
18 NEXXA who has access to the DNC Registry.
19    Q.   Okay.
20    A.   And who is a licensee to provide that
21 information.
22    Q.   Okay.  So your determination of whether
23 a given phone number was on the DNC list and
24 whether it was a cell phone or landline was

Page 12

1  something that NEXXA told you?
2     A.   NEXXA was just a vehicle to give us
3  access to the DNC Registry.  So that information
4  comes from the DNC Registry.
5     Q.   When you access that information, do you
6  provide the list of phone numbers to someone at
7  NEXXA who then checks and makes a report back to
8  you, or are you able to directly access the NEXXA
9  database without any intervening person being
10 involved?
11    A.   We have an intervening person that takes
12 the data and runs a report through their system.
13    Q.   And that person works for NEXXA?
14    A.   That is correct.
15    Q.   Who was the person that did that,
16 performed that function in this case?
17    A.   Are you looking for a title or a name?
18    Q.   A name ideally.
19    A.   I do not have that information to hand
20 you right now.  I simply do not recall.
21    Q.   Okay.  Do you know whether it was one
22 person or more than one person?
23    A.   It was one person who worked with A.B.
24 Data.  Beyond that I don't know how many more



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
13–16

Page 13

1   people were involved, if any.
2       Q.   Okay.  So as I understand what you're
3   telling me, you had a contact at NEXXA who you gave
4   the data to and told them what you needed, and they
5   delivered what you needed and you don't know
6   whether there were other people at NEXXA who were
7   involved in getting that information together for
8   you; is that fair?
9       A.   That's correct.
10      Q.   Okay.  In the course of your work in
11  this case, did you ask the plaintiffs' attorneys to
12  provide you with any information or documents?
13      A.   No, we did not.
14      Q.   So you did receive information and
15  documents from plaintiffs' counsel; correct?
16      A.   Correct.
17      Q.   But those were things that they gave to
18  you, not things that you asked them to provide?
19      A.   Correct.
20      Q.   All right.  And who did you deal with
21  primarily from plaintiffs' counsel?  Which lawyer?
22      A.   Ted Broderick and Matt McCue.
23      Q.   Did you have written communications with
24  Mr. Broderick and Mr. McCue about your work in this

Page 14

1   case?
2       A.   Yes.
3       Q.   E-mails?
4       A.   Yes.
5       Q.   Any other type of written
6   communications?
7       A.   No.
8       Q.   Did you deal with one more than the
9   other or both of them about equally?
10      A.   I would say about equally.
11      Q.   When were you first retained in this
12  case?
13      A.   A few months ago.
14      Q.   And who hired you?
15      A.   Ted Broderick and Matt McCue.
16      Q.   Do you have an engagement letter or an
17  agreement related to your work in this case?
18      A.   We have a cost estimate that has terms
19  and conditions attached.
20      MR. CUNNINGHAM:  Okay.  Off the record for
21  just a minute.
22          (WHEREUPON, a discussion was had off
23          the record.)
24      MR. CUNNINGHAM:  Back on the record.

Page 15

1   BY MR. CUNNINGHAM:
2       Q.   So we had an off-the-record discussion
3   for a second here.  We are not exactly sure whether
4   there is a cost estimate or not.  You think there
5   may be one; is that fair?
6       A.   My understanding is that there was an
7   e-mail sent with a cost estimate months back.
8       Q.   Okay.  And how are you being compensated
9   for your work in this case?  Are you charging by
10  the hour, or is there some other method by which
11  you are compensated?
12      A.   It's a combination.  I am billing my
13  hourly rate for this deposition for the data
14  analysis work that was done.  We are in the process
15  of preparing the invoices for that work, and it
16  will be a combination of a per record charge with a
17  few hours of data analysis.
18      Q.   With regard to the per record charge, do
19  you have any estimate -- do you recall without
20  looking at it any estimate of what that charge will
21  be?
22      A.   I don't recall the exact number.
23      Q.   Okay.  And then for the data analysis
24  piece, do you recall approximately how many hours

Page 16

1   of data analysis that you will be charging for were
2   performed?
3       A.   We -- I don't recall how many in this
4   case, but usually it's 10, 15 hours.
5       Q.   Okay.  And what is the rate for that
6   work?
7       A.   Usually it is a blended rate of $135 an
8   hour.
9       Q.   Okay.  Did you review any pleadings in
10  this case?  The Complaint or, you know, any
11  pleadings that have been filed in this case?
12      A.   No, I did not.
13      Q.   Did you review any deposition testimony,
14  affidavits or declarations?
15      A.   No, I did not.
16      Q.   Did you review any documents other than
17  the spreadsheets that are reflected in Paragraph 22
18  of your Affidavit, which we will get to in a
19  minute?
20      A.   No, I did not.
21      Q.   Okay.  In Paragraph 7 of your Affidavit
22  you say that's based upon your personal
23  knowledge and upon information provided by your
24  associates and employees.



Page 17

1          Can you tell me which associates and
2   employees were involved in your work in this case?
3       A.   Absolutely.  First, we have a project
4   manager who works on the team.  Then we have an
5   information system manager, quality assurance
6   coordinator, a paralegal, or clerical person, who
7   is involved, and an accountant.
8       Q.   Okay.  Anybody else?
9       A.   I believe that covers the team who
10  worked on this particular engagement.
11      Q.   Okay.  Who was the project manager?
12      A.   Christina Peters Staschevitz.
13      Q.   Can you spell it?  Because I know that I
14  can't.
15      A.   It's Peters, P-e-t-e-r-s.
16      MR. BRODERICK:  We all could have done that.
17  BY THE WITNESS:
18      A.   S-t-a-s-c-h-e-v-i-t-z.
19  BY MR. CUNNINGHAM:
20      Q.   And as project manager, what were her
21  duties and responsibilities in connection with this
22  work?
23      A.   She coordinated -- she worked closely
24  with me to coordinate the entire process and direct

Page 18

1   various team members on what they needed to do, as
2   well as communicated on a daily basis -- on a
3   day-to-day basis with plaintiffs' counsel.
4       Q.   Okay.  And the person that was in charge
5   of information systems, who was that?
6       A.   Kevin Zegler, Z-e-g-l-e-r.
7       Q.   And what were Kevin's duties and
8   responsibilities in connection with this work?
9       A.   He inputted the data that we received
10  from plaintiffs' counsel into our Records Database,
11  or CAAD, delineated which records were marked in
12  the files that were received as Vivint or Blue
13  Dolphin records, and went through the steps
14  outlined in my Affidavit with the data processing
15  team to make sure that he meets the requirements of
16  what was needed in that particular project.
17      Q.   Who is the quality assurance
18  coordinator?
19      A.   Linda Smith.
20      Q.   I won't even ask you to spell that one.
21      A.   Yes.
22      Q.   And what were Linda's duties and
23  responsibilities in connection with this work?
24      A.   She made sure that whatever information

Page 19

1   systems steps that were performed in this case
2   matched the description of Christina's and my
3   requirements.
4       Q.   Okay.  And who was the paralegal, or
5   clerical assistant?
6       A.   Orit Cohen.
7       Q.   I will have to ask you to spell that
8   one.
9       A.   C-o-h-e-n.
10      Q.   First name?
11      A.   O-r-i-t.
12      Q.   And what were the duties and
13  responsibilities of the paralegal or clerical
14  assistant?
15      A.   She coordinated the work with NEXXA in
16  making sure that the timelines were clear to all of
17  the parties involved.
18      Q.   And who was the accountant?
19      A.   Craig Smith, and he's not related to
20  Linda Smith -- or with Linda Smith.
21      Q.   Okay.  And I won't ask you to spell
22  Craig Smith either.  What were Craig's duties and
23  responsibilities in connection with this work?
24      A.   He is currently working with the project

Page 20

1   manager to put together the invoice for the work
2   that was performed.
3       Q.   Was there any information that you can
4   think of that you would have liked to have had as
5   you did your work but was unavailable to you?
6       A.   Not that I can think of.
7       Q.   Do you know whether any of the five
8   people that you just identified that worked on this
9   matter reviewed any deposition testimony,
10  affidavits or documents in relation to their work
11  on this case?
12      A.   I'm not aware of any.
13      Q.   Okay.  What do you understand, if you
14  have an understanding, the purpose of your work in
15  this case to be?
16      A.   Data analysis.
17      Q.   But for what purpose?  Do you have any
18  understanding of how that data analysis will be
19  used in this case?
20      A.   I -- I don't have an opinion on that.
21      Q.   Okay.  What did plaintiffs' counsel tell
22  you when they hired you they wanted you to do?
23      A.   Data analysis.
24      Q.   That's it?



Page 21

1    A.   That's it.
2    Q.   Okay.  Are you aware that the Affidavit
3  that you have given in this case is being used to
4  support a motion to certify a class?
5    A.   I am aware of that.
6    Q.   Okay.  And do you have any understanding
7  of how your work in this case relates to that
8  motion?
9    A.   I did not give it a thought.
10    Q.   Okay.  Have you seen the motion to
11  certify a class in this case?
12    A.   No, I haven't.
13    Q.   You didn't play any role in drafting
14  that motion?
15    A.   No, I did not.
16    Q.   Did you play any role in defining the
17  classes that the plaintiff seeks to certify in this
18  case?
19    A.   No, I did not.
20    Q.   I am going to hand you a document that
21  has been previously marked in this case as Exhibit
22  30, 3-0.
23       Based on what you have told me so far
24  today, is it true that this is the first time that

Page 22

1  you have seen this document?
2    A.   This is the first time that I'm seeing
3  this document.
4    Q.   Plaintiffs' counsel did not provide you
5  with this document before?
6    A.   If they have, I don't recall it.
7    Q.   Do you know what this document is?
8    A.   It's a list of dates and numbers, but I
9  don't know what that is.
10    Q.   Okay.  You don't know what they
11  represent?
12    A.   I don't know what they represent.
13    Q.   Okay.  Since you haven't seen this
14  before, is it a fair conclusion on my part that you
15  did not make any effort to determine how many, if
16  any, of the telephone numbers on Exhibit 30 were
17  cell phone numbers as opposed to landline numbers?
18    A.   I can't say that, because there is a
19  possibility that some of these phone numbers were
20  part of millions of records that we received, and I
21  don't know one way or another.
22       If some of these numbers were parts of
23  the records we received, then we did look up if
24  those phone numbers were cellular phone numbers and

Page 23

1  whether they were on the DNC list.
2    Q.   Okay.  Fair enough.  If there were --
3  if there is overlap between this list of phone
4  numbers and the list of phone numbers that you were
5  provided, then perhaps you did check these phone
6  numbers?
7    A.   Perhaps.
8    Q.   But that would be the only way that we
9  would know; right?
10    A.   Correct.
11    Q.   Because you didn't have this document?
12    A.   No.
13    Q.   Okay.  You can set that aside.
14       In Paragraph 22 of your report, which I
15  will, I promise, give you in a minute and we can
16  look at it --
17    A.   Thank you.
18    Q.   -- you list a number of Excel
19  spreadsheets that you say that you received from
20  plaintiffs' counsel.  There are 25 of them listed.
21  Do you recall that?
22    A.   That sounds correct.
23    Q.   Okay.  Did plaintiffs' counsel provide
24  you with just those 25 spreadsheets, or were there

Page 24

1  others that were provided as well?
2    A.   My understanding is that the only
3  spreadsheets that we received were those 25
4  spreadsheets.
5    Q.   And do you know why those 25 were
6  selected?
7    A.   I don't.
8    Q.   Do you have any understanding of how
9  many total spreadsheets there are that were --
10  well, let me back up.
11       First, do you know where those
12  spreadsheets came from?
13    A.   Plaintiffs' counsel.
14    Q.   Do you know where plaintiffs' counsel
15  got them?
16    A.   No.
17    Q.   Okay.  Regardless of the total universe
18  of spreadsheets, you didn't pick those 25.
19  Plaintiffs' counsel picked those 25 and delivered
20  them to you; is that true?
21    A.   That's correct.
22    Q.   Okay.  How were they provided?  Did they
23  put them on a disc and give you to you, or did
24  they make them available via a FTP site?  Or how



Page 25

1  were they delivered?
2      A.   I do not recall.
3      Q.   Okay.  And you don't know whether those
4  were all of the spreadsheets plaintiffs' counsel
5  has regarding calls that might be an issue in this
6  case; is that fair?
7      A.   Correct.
8      MR. CUNNINGHAM:  Okay.  I will mark this
9  Exhibit No. 110, which is the current number that
10  we are up to in this case.
11            (WHEREUPON, a certain document was
12            marked Defendant's Deposition
13            Exhibit No. 110, for identification,
14            as of 11-19-13.)
15  BY MR. CUNNINGHAM:
16      Q.   First question:  Do you recognize the
17  document marked as Exhibit 110?
18      A.   Yes, I do.
19      Q.   What is it?
20      A.   It's my Affidavit.
21      Q.   You prepared this Affidavit in
22  connection with your work in this case?
23      A.   That's correct.
24      Q.   And if we turn to Paragraph 22 of your

Page 26

1  Affidavit on Page 6, is this a complete and
2  accurate listing of all of the spreadsheets that
3  you received from plaintiffs' counsel?
4      A.   Yes, it is.
5      Q.   There are no other spreadsheets that you
6  received that you didn't list here?
7      A.   That's correct.
8      Q.   Each of the 25 files that you list in
9  Paragraph 22 appears to be the name of a computer
10  file; is that correct?
11      A.   That's correct.
12      Q.   And do you know what the word Savantius,
13  S-a-v-a-n-t-i-u-s, means in each file name?
14      A.   What it meant to me?  No, I'm not sure.
15  Probably -- no, I'm not sure.
16      Q.   Are you aware of a company by that name?
17      A.   I believe in some of the communications,
18  verbal communications, the name of that company was
19  mentioned.
20      Q.   Okay.  And do you have any understanding
21  of that company's connection to this case?
22      A.   Not a very good one.
23      Q.   Even if it's a bad one, tell me what
24  your understanding is, if you have one.

Page 27

1      A.   I think my understanding is that they
2  played some role in providing some data during the
3  robo calls.  That's all that I know.
4      Q.   Okay.  Are you aware of any connection
5  between my client, Vivint, and Savantius?
6      A.   I'm not.
7      Q.   You are aware of a company called Blue
8  Dolphin?
9      A.   Yes, I am.
10      Q.   You used the name Blue Dolphin in some
11  of the work that you did that we're going to talk
12  about in this case; is that correct?
13      A.   That's correct.
14      Q.   Are you aware of any connection between
15  Blue Dolphin and Savantius?
16      A.   I am not sure what that connection is.
17      Q.   But you believe there is some
18  connection?
19      A.   I believe there is some connection;
20  otherwise, those names would not appear together in
21  one affidavit and one data set.
22      Q.   What is your understanding of why each
23  of these file names begin with the word Savantius
24  followed by a numeral?  For example, some of them

Page 28

1  are Savantius 2 and some of them are Savantius 7
2  and others are Savantius 8.
3      A.   I have no knowledge or understanding
4  why.
5      Q.   Do you know whether there are other
6  files that start with the word Savantius 6 or
7  Savantius 5 or some other number?
8      A.   No knowledge of it.
9      Q.   Did you ask Plaintiffs' counsel about
10  that?
11      A.   No, I did not.
12      Q.   Do you have an interpretation of the
13  string of numbers following the Savantius 2 portion
14  of each file name or the Savantius 8 or Savantius 7
15  portion?
16      A.   No, I do not.
17      Q.   They appear to me to be date ranges.
18  The first one, for example, says 2012 03/01 through
19  2013 03/31.  Do you see that?
20      A.   I do.
21      Q.   But you don't draw the conclusion that
22  that's a date range?
23      A.   It is one possibility.
24      Q.   Okay.  Did you ask about that?



Page 29

1    A.   No, I did not.
2    Q.   Would that have been important to your
3    work in any way?
4    A.   No.
5    Q.   Each of those strings of numbers,
6    whatever they represent, is then followed by
7    something that appears to be a part number.
8         So, for example, the first group of
9    spreadsheets here, the Savantius 2 spreadsheets we
10   see a part 1, 2, 3, 4, and so on through 8.  Do you
11   see that?
12   A.   Yes, I do.
13   Q.   Do you know if those were the only parts
14   of a larger data set for each of whatever these
15   groupings may be?
16   A.   I do not know.
17   Q.   Did you ask about that?
18   A.   No, I did not.
19   Q.   Do you know whether --  strike that.
20        Within each spreadsheet, and we will
21   look at the sample from the spreadsheets in a
22   minute, there is a column of information that is
23   labelled, "Campaign."  Do you remember that?
24   A.   Yes, I do.

Page 30

1    Q.   Okay.  Do you know whether the same
2    campaigns identified in that column appear in
3    different parts of the same group of spreadsheets?
4    In other words -- do you follow my question?
5         Let me try to ask it in a better way.
6    A.   Thank you.
7    Q.   Let's assume that for the very first
8    spreadsheet that's listed here there is something
9    listed in the Campaign column called Absolute APPT.
10   Do you know whether that same name, Absolute APPT,
11   would appear in other spreadsheets in this group?
12   A.   As a column heading?
13   Q.   No.  As information within that column.
14   A.   It is a possibility.
15   Q.   Okay.  Are you aware of any logical
16   basis for dividing these spreadsheets into these
17   different parts?
18   A.   I'm not.
19   Q.   Is there any -- strike that.
20        These spreadsheets appear to me to be
21   Excel files; is that correct?
22   A.   That is correct.
23   Q.   Is there any limitation that you are
24   aware of in the Microsoft Excel program on the size

Page 31

1    of a spreadsheet?
2    A.   Which Microsoft Excel?
3    Q.   Good question.  I don't know the answer
4    to that.  Is there a version of Microsoft Excel in
5    which it would matter, that there is a limitation
6    on the size?
7    A.   Yes.
8    Q.   Which version or versions of Excel are
9    you aware of that carry that limitation?
10   A.   I believe 2001 has 33,000; 2003 has
11   66,000; and 2007 and up has no limitation.
12   Q.   Okay.  So if these spreadsheets were
13   first created using a version of Excel prior to
14   Excel 2007, it's possible that they were divided
15   because they were too large to all be in a single
16   spreadsheet?
17   A.   It's possible.
18   Q.   But you didn't -- you don't know whether
19   that's true or not?
20   A.   Correct.
21   Q.   Okay.  If we look in Paragraph 22 at
22   Roman numerals -- or Romanette xxii and xxiii,
23   Romanette xxii appears to be spreadsheets related
24   to something called Savantius 7, and that file ends

Page 32

1    with the name Part 4, and then the spreadsheet
2    beneath it has exactly the same name except it ends
3    in Part 6.  Do you see that?
4    A.   Yes, I do.
5    Q.   Do you have any explanation for whether
6    there was a part 5 of that spreadsheet?
7    A.   I do not.
8    Q.   Did you ask for part 5?
9    A.   We did not.
10   Q.   And did anybody give you any explanation
11   for why there is a part 4 and a part 6 but no part
12   5?
13   A.   Not to me personally.
14   Q.   What do you believe these 25
15   spreadsheets that you received show?
16   A.   As stated in Paragraph 22, those are
17   call lock files that we received from plaintiffs'
18   counsel.
19   Q.   Do you know who placed the calls that
20   you believe those spreadsheets reflect?
21
22
23
24



Page 33

1     A.   I believe the spreadsheets had that
2   information included in those spreadsheets.
3            (WHEREUPON, a certain document was
4            marked Defendant's Deposition
5            Exhibit No. 111, for identification,
6            as of 11-19-13.)
7   BY MR. CUNNINGHAM:
8     Q.   Okay.  I am going to hand you a document
9   marked Exhibit 111.  You are free to look at it if
10  you would like to, but, have no fear, I'm going to
11  give you a version that you can actually read in a
12  moment.  So bear with me for just one moment.
13    A.   I thought this was a test.
14           (WHEREUPON, a certain document was
15           marked Defendant's Deposition
16           Exhibit No. 111-A, for
17           identification, as of 11-19-13.)
18  BY MR. CUNNINGHAM:
19    Q.   Okay.  Now, I'm going to hand you one
20  that I have marked as Exhibit 111-A.  111-A is a
21  large, cumbersome sheet of paper will be difficult
22  for us to deal with in this case, which is why I
23  have marked 111 separately, but I will represent to
24  you that 111-A is simply an enlargement of 111.

Page 34

1   It's still pretty small.
2            The first question is:  Do you recognize
3   at least the format of the document that's marked
4   111-A?
5     A.   Yes, I do.
6     Q.   Okay.  And I will represent to you that
7   this is a printed page from the first page of the
8   spreadsheet listed in Paragraph 22, Romanette i
9   in your report.  So it's the very first page of the
10  very first spreadsheet, and that in printing that
11  page we have scaled it so that all of the columns
12  fit on a single page, which is why it's tiny, tiny
13  print.
14           Does this appear to be consistent with
15  your recollection of the information contained in
16  the spreadsheets that you reviewed?
17    A.   It does.
18    Q.   Okay.  Now, a minute ago I asked you if
19  you knew or had an understanding of who made the
20  telephone calls that you believe these records
21  reflect, and you said that you believed that
22  information might be in the spreadsheets.
23           Having looked at Exhibit 111-A, are you
24  able to tell me who your understanding is placed

Page 35

1   the telephone calls that you believe these records
2   reflect?
3     MR. BRODERICK:  Objection.
4   BY MR. CUNNINGHAM:
5     Q.   And I should have told you right up
6   front that this is not a memory test, this is not
7   an endurance test.  If you need a break or we need
8   to address anything, just let me know.
9     A.   Thank you.  It is more an assumption
10  than an understanding, but we sorted -- one of the
11  steps that we took in data analysis of this data
12  set is separating Vivint and Blue Dolphin campaigns
13  out of the old campaigns that -- out of all data
14  that were, I believe, in the campaign column, and
15  our assumption was that it is somehow relevant to
16  who made those calls.  That's all that we know
17  really.  That's all that I know.
18    Q.   So is it your understanding or
19  assumption -- if we look at the Campaign column
20  here, the name that's all throughout that column on
21  this one selected page is Absolute APPT.  Is it
22  your understanding or belief that the phone calls
23  that are reflected here are phone calls that were
24  made by Absolute APPT?

Page 36

1     A.   No, it's not.  It's just the name of the
2   campaign.  That is our understanding.
3     Q.   What is a campaign?
4     A.   A campaign is the column heading in the
5   column "Campaign."
6     Q.   But what does that mean?
7     A.   We don't know really.
8     Q.   Okay.  And if you're not assuming or you
9   don't know that Absolute APPT made all the phone
10  calls, if, in fact, these are phone calls that
11  we're looking at in this data, do you have an
12  understanding or a belief as to who did make the
13  phone calls that are reflected in this data?
14    A.   We do not have an understanding or
15  knowledge of who made those phone calls.
16    Q.   Have you ever heard of a company called
17  Five 9?  It's spelled F-i-v-e and numeral 9?
18    A.   I'm not sure.  I don't recall.
19    Q.   Do you have any understanding of any
20  connection between Five 9 and this case?
21    A.   I don't think so, and if I'm missing
22  something, I just don't recall.
23    Q.   You didn't review any transcript of a
24  deposition, declaration or affidavit from anyone at



Page 37

1 Five 9?
2    A.   Not that I recall.
3    Q.   And none of the people that worked on
4 this at A.B. Data would have reviewed a deposition
5 transcript, affidavit or declaration from Five 9?
6    A.   Not that I'm aware of.
7    Q.   Okay.  If we assume that the record that
8 we are looking at as Exhibit 111-A is a record of
9 phone calls, do you have an understanding of what
10 the purpose of the calls was?
11         (WHEREUPON, there was a brief
12         interruption.)
13 BY THE WITNESS:
14    A.   Once again, my apologies.
15 BY MR. CUNNINGHAM:
16    Q.   That's all right.  I believe the
17 question that's pending is do you know what the
18 purpose of these calls was, assuming these are
19 calls?
20    A.   I'm not sure.
21    Q.   Do you know whether they -- whatever the
22 purpose was, do you know whether they all had the
23 same purpose or a purpose that varied?
24    A.   I did not give it a thought.

Page 38

1    Q.   Did you do any research or take any
2 steps or do any work of any kind to identify the
3 names that are listed in the Campaign column to try
4 to understand whether those are companies or
5 something else?
6    A.   I did not.
7    Q.   Did you make an assumption that those
8 were companies that were listed in the Campaign
9 column?
10    A.   We did not.
11    Q.   Did plaintiffs' counsel tell you
12 anything about the data that's contained in these
13 spreadsheets?
14    A.   Yes.
15    Q.   What did they tell you?
16    A.   That the data contains a list of phone
17 numbers, and they gave us instructions on what they
18 needed us to do to analyze that list.
19    Q.   What were those instructions?
20    A.   As outlined in the Affidavit, we would
21 determine how many in Paragraph 25 -- we were
22 directed to determine how many calls were marked as
23 a Blue Dolphin campaign, how many were in the
24 Vivint campaign, and how many of those were made to

Page 39

1 unique telephone numbers in both campaigns.
2         As we discussed earlier, we also refer
3 to this process as de-duplication.  How many of
4 those phone numbers were cell phone numbers, how
5 many were on the Do-Not-Call Registry, and when, if
6 that information was available on the DNC Registry,
7 and how many of those calls were more than zero
8 seconds in duration.
9    Q.   Okay.  Did they tell you anything about
10 why those issues were relevant to this case?
11    A.   No.
12    Q.   Okay.  Do you know anything about the
13 equipment or the system that was used to make these
14 telephone calls, assuming that this is evidence of
15 phone calls?
16    A.   No.
17    Q.   So in Paragraph 23 of your Affidavit you
18 say that you understand the calls on these
19 spreadsheets were made using automated dialing
20 equipment.
21    A.   Correct.
22    Q.   Do you see that?
23    A.   Uh-huh.
24    Q.   You don't know that to be true; is that

Page 40

1 correct?
2    A.   Well, it is our understanding that it is
3 automated dialing equipment, but that's all that we
4 know.
5    Q.   What is that understanding based on?
6    A.   By information provided to us by
7 plaintiffs' counsel.
8    Q.   What information did they provide you
9 that suggested that these calls were made using
10 automated dialing equipment?
11    A.   They stated that these calls were made
12 by automated dialing equipment.
13    Q.   So you didn't really have any
14 information.  It's just something that they told
15 you?
16    A.   Correct.
17    MR. BRODERICK:  Objection.
18 BY MR. CUNNINGHAM:
19    Q.   They told you that automated dialing
20 equipment was used to make these phone calls?
21    A.   I believe that's where we derived our
22 understanding that that's the case.
23    Q.   Are you offering any opinion or
24 conclusion in this case that whoever made these



Page 41

1   calls made them using automated dialing equipment?
2      A.   I'm not.
3      Q.   And you weren't asked to review any
4   evidence or offer any opinions or conclusions
5   regarding the use of automated dialing equipment;
6   is that true?
7      A.   That's correct.
8      Q.   Does it matter for the work that you
9   performed in this case whether the calls were made
10  using automated dialing equipment or not?
11     A.   It does not matter.
12     Q.   If it doesn't matter, is there some
13  reason why you chose to include that statement in
14  Paragraph 23 of your report?
15     A.   It describes our understanding of the
16  work that we were performing.  It describes our
17  understanding of the data that we received.
18     Q.   Did you write this report yourself, or
19  did someone prepare it for you?
20     MR. BRODERICK:  Objection.
21  BY THE WITNESS:
22     A.   It's a combination of both.
23  BY MR. CUNNINGHAM:
24     Q.   With respect to the reference to the use

Page 42

1   of automated dialing equipment in Paragraph 23, who
2   wrote that portion of the report?
3      MR. BRODERICK:  Objection.  I'm going to
4   object.  You are not entitled to prior reports.  So
5   you're asking about -- essentially that's a request
6   about a draft.  I will object and instruct her not
7   to answer.
8   BY MR. CUNNINGHAM:
9      Q.   You also say in Paragraph 23 that the
10  numbers may have been on the federal Do-Not-Call
11  Registry.
12        When you said they may have been on the
13  DNC, do you actually know whether these numbers are
14  or are not on the National DNC?
15     A.   I believe that at the time Paragraph 23
16  was drafted, we were describing the data set that
17  we initially received, and it is possible that any
18  phone number that was in any data set may have
19  appeared on the Do-Not-Call Registry.
20     Q.   Okay.  So at the time that you received
21  the spreadsheets, you didn't know but you were told
22  that they might be on the federal Do-Not-Call
23  Registry?
24     A.   I'm not sure we were told that.  I think

Page 43

1   it was an assumption made based on our knowledge of
2   the Do-Not-Call Registry.
3      Q.   When were the 25 spreadsheets that you
4   worked with first created?
5      A.   I do not know that.
6      Q.   Who created the 25 spreadsheets that you
7   reviewed and analyzed in this case?
8      A.   I do not know.
9      Q.   Do you know if they were made or created
10  by the company that actually made the telephone
11  calls?
12     A.   I do not know.
13     Q.   And do you know if they were created by
14  Five 9?
15     A.   I do not know.
16     Q.   Do you know whether the company that
17  made these calls changed over time?
18     A.   I do not know.
19     Q.   So you don't even know that all of these
20  calls were made by the same company; is that fair?
21     A.   I do not know.
22     Q.   Do you know whether the method by which
23  whoever made these calls changed over time?
24     A.   I do not know.

Page 44

1      Q.   Do you know whether the data -- the way
2   that the data was compiled and then input into the
3   spreadsheets changed over time?
4      A.   I do not know.
5      Q.   Do you know how these spreadsheets were
6   created?
7      A.   I do not know.
8      Q.   Do you know what system the data that is
9   reported in these spreadsheets came from?
10     A.   I do not know.
11     Q.   Is it a fair assumption, I will confess
12  to you that is an assumption on my part, that this
13  data was reported in an Excel readable format from
14  some other system?
15     MR. BRODERICK:  Objection.
16  BY MR. CUNNINGHAM:
17     Q.   Would you agree that's a fair
18  assumption?
19     A.   It's a possibility.
20     MR. BRODERICK:  Objection.
21  BY MR. CUNNINGHAM:
22     Q.   Are you familiar at all with the
23  technology that's used by companies that engage in
24  large volumes of telephone calls?



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
45–48

Page 45

1     A.    I'm not sure that I understand your
2  question.
3     Q.    Do you have any experience at all with
4  the -- we will call it the telemarketing industry?
5     A.    What type of experience?
6     Q.    Here is what I'm getting at.  There are
7  companies that make large volumes of calls,
8  hundreds of thousands, millions of calls.  Are you
9  familiar at all with any company in any industry
10  that makes calls of that magnitude of volume?
11     A.    I'm familiar there are companies that
12  exist that do that.
13     Q.    And are you familiar with the methods by
14  which those companies create and maintain their
15  data regarding those phone calls?
16     A.    I don't have first-hand knowledge of
17  that.
18     Q.    Okay.  So you couldn't tell me anything
19  at all about a system that first collects or
20  creates data regarding the phone call and then
21  reports that data in some way that can be used by
22  somebody like you?
23     A.    That's correct.
24     Q.    Okay.  Can you tell me anything at all

Page 46

1  about the system that collected the data that is
2  shown in these spreadsheets?
3     A.    I cannot tell you anything about that.
4     Q.    So you don't know what kind of software
5  was used?
6     A.    I do not know.
7     Q.    Do you know whether that system,
8  whatever it was, was subject to any kind of
9  auditing or quality control?
10     A.    I do not know.
11     Q.    Do you know whether that system changed
12  over time?
13     A.    I do not.
14     Q.    Do you know anything about how the
15  information that was used to generate these
16  spreadsheets was itself developed?
17     A.    I do not know.
18     Q.    So you wouldn't know, for example,
19  whether the information went directly into this
20  spreadsheet or was first maintained in some other
21  database and then exported into an Excel
22  spreadsheet; is that true?
23     A.    That's correct.
24     Q.    Do you know anything about how the 25

Page 47

1  spreadsheets described in Paragraph 22 of your
2  report were maintained by whoever kept them?
3     A.    I have no knowledge of that.
4     Q.    Do you know anything about any steps
5  taken to insure that the records in those
6  spreadsheets are accurate?
7     A.    I have no knowledge of that.
8     Q.    Is it fair to say that you don't have
9  any knowledge or information about how these
10  spreadsheets were made and kept?
11     A.    That's correct.
12     Q.    Have you seen any transcripts or any
13  depositions, any declarations or affidavits that
14  relate in any way to the creation of the 25
15  spreadsheets listed in Paragraph 22?
16     A.    I did not see those.
17     Q.    Do you know how these spreadsheets were
18  used before they were delivered to you assuming
19  that they were used for some other purpose?
20     A.    I do not have that information.
21     Q.    Okay.  Let's move on to Paragraph 25.
22  In Paragraph 25 of your report you indicate that
23  you received and analyzed the spreadsheets that you
24  were provided by counsel.

Page 48

1     The first question is:  When did you
2  receive these 25 spreadsheets?
3     A.    As outlined in Paragraph 25, the call
4  logs were received on August 15, 2013.
5     Q.    And when did you perform the analysis
6  that you performed on these call log files?
7     A.    Shortly after.
8     Q.    If we skip ahead to Paragraph 36, you
9  list a corresponding set of 25 spreadsheets, and
10  you indicate at the end of Paragraph 36 that you
11  created those spreadsheets.  Do you see that?
12     A.    Yes.
13     Q.    Those spreadsheets, as I understand your
14  report, are a report of the output of at least a
15  portion of your analysis; is that correct?
16     A.    That's correct.
17     Q.    Were there any other reports of the
18  output of your analysis other than the 25
19  spreadsheets listed in Paragraph 36?
20     A.    Yes.
21     Q.    And what were those reports?
22     A.    Those reports were run to generate
23  numbers that are outlined from Paragraph 25 to
24  Paragraph 37.  So the spread -- those reports



Page 49

1  basically just produced the number of certain
2  criteria that we were looking for.
3      Q.   Interim steps in between the initial --
4      A.   Correct.
5      Q.   -- data set and then what became the
6  spreadsheets that are reported in Paragraph 36; is
7  that fair?
8      A.   That's correct.
9      Q.   Okay.  Now, based on your review and
10  analysis, you indicate that 627,929 calls initiated
11  in the Blue Dolphin campaigns were made to cellular
12  telephone numbers.  Is that an accurate summary of
13  what I'm reading in Paragraph 25-A, Romanette i?
14      A.   That's correct.
15      Q.   How did you identify Blue Dolphin
16  campaigns?
17      A.   We parsed out records that had Blue
18  Dolphin listed in their Campaign column.
19      Q.   Did you first combine all 25
20  spreadsheets into one searchable or useable
21  spreadsheet or database?
22      A.   Database, that's correct.
23      Q.   And what program did you use to combine
24  all 25 spreadsheets?

Page 50

1      A.   A proprietary database.
2      Q.   And then how did you search for Blue
3  Dolphin within that proprietary database?
4      A.   We asked our information system manager
5  to provide us with a report, a number, of all
6  records that had Blue Dolphin listed in the
7  campaign column.
8      Q.   So did he do that by sorting that
9  column, and then just finding Blue Dolphin?  Or did
10  he use some kind of a search or find tool to find
11  Blue Dolphin?  Or how did he identify Blue Dolphin
12  campaigns?
13      A.   Both.  We have several methods that we
14  use to do that to make sure that the numbers match.
15      Q.   Now, were there more than one campaign
16  related to Blue Dolphin or just one?
17      A.   I do not know whether there was more
18  than one campaign.  I know that when we sorted, we
19  sorted by Blue Dolphin in the Campaign column.
20  What actually happened, I don't know.
21      Q.   Okay.  When I do that myself, I see
22  three different Blue Dolphin campaigns.  One is
23  described as Blue Dolphin, one word,
24  B-l-u-e-D-o-l-p-h-i-n, 16 underscore 2-16, and then

Page 51

1  I see another one called Blue Dolphin 19, and then
2  I see a third one Blue Dolphin 9.
3      Did you see those three separate
4  campaigns when you did your work in this case?
5      A.   Correct.  But when we searched by Blue
6  Dolphin, they all show up as containing Blue
7  Dolphin; therefore, we did not -- we were not
8  instructed to parse out.
9      Q.   So you didn't make any effort to sort
10  out any differences between those three different
11  campaign descriptions I guess that I will call
12  them?
13      A.   Correct.
14      Q.   And do you have any understanding of
15  whether those were three totally separate campaigns
16  or just three different ways to talk about the same
17  campaign, or do you have any understanding at all?
18      A.   I do not have any understanding of it.
19      Q.   Is it possible that those three
20  campaigns -- well, strike that.
21      Do you know anything about Blue Dolphin
22  at all?
23      A.   I do not know anything really about Blue
24  Dolphin.

Page 52

1      Q.   So you don't know whether that's a
2  company, or just the name of a project or --
3      A.   My understanding is that it is probably
4  a company.
5      Q.   Okay.  What is that understanding based
6  on?
7      A.   Based on some conversations that we had
8  about this work.
9      Q.   What do you remember about those
10  conversations as they related to Blue Dolphin?
11      A.   I asked what is Blue Dolphin, and I was
12  told one of the companies.
13      Q.   Do you know what line of business Blue
14  Dolphin may have been in?
15      A.   I don't recall.  I am not sure.
16      Q.   Do you have any understanding between
17  any connection between Blue Dolphin and Vivint?
18      A.   I'm not sure what that connection is.
19      Q.   Do you believe there is a connection?
20      A.   It is likely.
21      Q.   Why do you say it's likely?
22      A.   Because we were asked to do the work to
23  deliver -- to do the data analysis, and both were
24  involved.  Therefore, it is likely that there is a



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
53—56

Page 53

1 connection.
2    Q.   Okay.  No other reason?
3    A.   No other reason.
4    Q.   Okay.  Have you ever heard of a company
5 called Revocalize, R-e-v-o-c-a-l-i-z-e?
6    A.   I believe so.
7    Q.   How are you familiar with Revocalize?
8    A.   I know the company Revocalize exists.
9 That's all that I know.
10    Q.   Do you have any understanding of any
11 relationship of Revocalize to this lawsuit?
12    A.   No.  I don't have really an
13 understanding.
14    Q.   Do you have any understanding of any
15 relationship between Blue Dolphin and Revocalize?
16    A.   Not really.
17    Q.   Have you ever heard of a company called
18 Direct Access, D-i-r-e-c-t A-c-c-e-s-s?
19    A.   I never heard of that company.
20    Q.   Getting back to the Blue Dolphin
21 campaigns that you identified, what is your
22 understanding of what a Blue Dolphin campaign is,
23 if any?
24    A.   I don't have an understanding.

Page 54

1    Q.   And I take it based on your answer to my
2 prior questions about the creation of these
3 spreadsheets, that you do not have any knowledge of
4 who put Blue Dolphin into these spreadsheets,
5 literally the words Blue Dolphin?
6    A.   That's correct -- your understanding is
7 correct.  I have no knowledge of that.
8    Q.   Okay.  And then you indicate in
9 Paragraph 25-A, Romanette ii, that the 346,426
10 calls that you found were initiated in the Blue
11 Dolphin campaigns and are identified as being
12 connected in some way to the Blue Dolphin campaigns
13 to unique telephone numbers.  This is the
14 de-duplicating that we talked about?
15    A.   That's correct.
16    Q.   How did you determine that?
17    A.   In the same way that I described in the
18 beginning of this deposition.  We standardized the
19 phone numbers first, and then identified the number
20 of unique telephone numbers.
21    Q.   And Kevin did that work?
22    A.   Correct.
23    Q.   How many of those 346,426 unique
24 telephone numbers were cell phone numbers?

Page 55

1    MR. BRODERICK:  Sorry.  Which paragraph were
2 you asking about?
3    MR. CUNNINGHAM:  25-A, Romanette ii.
4 BY THE WITNESS:
5    A.   I believe in Paragraph 24 we described a
6 process where all of the data that was received was
7 first cross-referenced to the cellular records, and
8 that step was performed before, and those records
9 were identified and parsed out, and only then the
10 calls were identified as Blue Dolphin campaign
11 calls made to unique telephone numbers and calls
12 that were connected.
13    So to answer your question, it is my
14 understanding that Paragraph 25-A and Paragraph
15 25-B talks only about cellular telephone numbers.
16 BY MR. CUNNINGHAM:
17    Q.   So they would all be cellular phone
18 numbers; is that correct?
19    A.   That's correct.
20    MR. CUNNINGHAM:  Let's go off the record for a
21 moment.
22    (WHEREUPON, a discussion was had off
23     the record.)
24    MR. CUNNINGHAM:  Back on the record.

Page 56

1 BY MR. CUNNINGHAM:
2    Q.   Before I continue with my questioning
3 about the document marked 111-A, my colleague,
4 Mr. Jaszczuk, reminds me that it will make it a
5 little smoother for us if we just put on the record
6 that for purposes of my questions to you we are
7 assuming that these are, in fact, records of
8 telephone calls.
9    That's a fair assumption that I think
10 that you made because you were asked to make that
11 assumption; right?
12    A.   That's correct.
13    Q.   Okay.  And so my questions are assuming
14 that without necessarily verifying that that is, in
15 fact, what we are looking at.  Okay?
16    A.   Understood.
17    Q.   Okay.  In Paragraph 25, after
18 subparagraph A dealing with Blue Dolphin, you have
19 subparagraph B, which deals with Vivint.
20    And you refer to certain calls that were
21 initiated in the Vivint campaigns as described in
22 the 25 spreadsheets that you reviewed.
23    What is your understanding of what a
24 Vivint campaign is?



Page 57

1    A.   It's a campaign in the column -- in the
2  column "Campaign" it's stated that it's Vivint.
3  That's my understanding for the data analysis
4  purposes.
5    Q.   Do you have any understanding for what
6  that means, though, for a call -- any given call in
7  these records to be designated as being related to
8  a campaign that uses the word Vivint?  Do you have
9  any understanding of what that means?
10    A.   I have an understanding that there is a
11  relationship, but I don't know what that
12  relationship is.
13    Q.   Okay.  Do you know who decided what a
14  Vivint campaign was?
15    A.   I have no information on that.
16    Q.   Do you know whether Vivint or anyone at
17  Vivint, any employee or agent of Vivint, had any
18  involvement or even knowledge of what someone else
19  may have been calling a Vivint campaign?
20    A.   I have no information on that.
21    Q.   Were you provided with the transcripts
22  from the depositions or any declarations or
23  affidavits from Jesse Leishman, L-e-i-s-h-m-a-n?
24    A.   I was not.

Page 58

1    Q.   Or a gentleman named Kevin O'Barr,
2  O-'-B-a-r-r?
3    A.   I have no information on that.
4    Q.   Do you know whether there was one
5  campaign related to Vivint or more than one?
6    A.   I have no knowledge of that.
7    Q.   Okay.  Do you know whether the calls in
8  these 25 spreadsheets that describe the campaign as
9  being related to Vivint in some way were part of a
10  campaign that changed over time or remained the
11  same?
12    A.   I do not know.
13    Q.   Were there any changes in how the data
14  reflected in these 25 spreadsheets was compiled
15  related to the Vivint campaigns?
16    A.   Not that I noticed.
17    Q.   And did Kevin do the work to determine
18  which of the calls in these 25 spreadsheets
19  reflected a Vivint campaign?
20    A.   Yes, he did.
21    Q.   How did Kevin do that work?
22    A.   In the same method that was described in
23  identifying Blue Dolphin calls.
24    Q.   He used both a sort function to sort

Page 59

1  that column as well as a search and find function?
2    A.   Correct.
3    Q.   Is it true that you have no knowledge of
4  who put the word "Vivint" into these 25
5  spreadsheets?
6    A.   That's correct.
7    Q.   Or why they did that?
8    A.   That's correct.
9    Q.   Or what they intended to signify by
10  that?
11    A.   That's correct.
12    Q.   Can you tell from these records how the
13  people that you believe were called got on a list
14  to be called?
15    A.   I cannot tell.
16    Q.   So there is no way to tell from these
17  records whether these were people who had expressed
18  some interest in a product or service or agreed to
19  receive these calls; is that fair?
20    A.   I'm not aware of any.
21    Q.   So if we assume that one company made
22  all of the calls that are described in the 25
23  spreadsheets that you reviewed, if I understand
24  your testimony, you can't tell me who made the

Page 60

1  calls; right?
2    A.   That's correct.
3    Q.   You can't tell me why they made the
4  calls; correct?
5    A.   That's correct.
6    Q.   You can't tell me why the individuals
7  who were called received those calls?
8    A.   That's correct.
9    Q.   Or how they got on a list to receive
10  calls?
11    A.   That's correct.  That's not the scope of
12  my testimony.
13    Q.   Understood.  You can't tell me what the
14  purpose of the calls were?
15    A.   Correct.
16    Q.   You can't tell me who the calls were
17  made for?
18    A.   That's correct.
19    Q.   You can't tell me what happened, if
20  anything, after these calls were made?
21    A.   That's correct.
22    Q.   Now, the name of the plaintiff in this
23  lawsuit is Matthew Benzion, B-e-n-z-i-o-n.  Were
24  you aware of that?



Page 61

1    A.   Yes, I am.
2    Q.   Did you run Mr. Benzion's name or
3  telephone number through these spreadsheets?
4    A.   I assume that we did.
5    Q.   Okay.  And what did you find?
6    A.   I do not know exactly what his phone
7  number search resulted.
8    Q.   So you don't know whether either
9  Mr. Benzion or his phone number appear anywhere in
10  these 25 spreadsheets?
11   A.   I assume that it does.
12   Q.   Okay.  Why do you assume that?
13   A.   Based on my prior experience.
14   Q.   If you searched these records and you
15  did not find either Mr. Benzion's name or telephone
16  number anywhere in them, would you be able to draw
17  any conclusion from that?
18   MR. BRODERICK:  Objection.
19  BY THE WITNESS:
20   A.   I can't tell you what happened based on
21  the hypothetical situation.
22  BY MR. CUNNINGHAM:
23   Q.   Okay.  Did you find any calls that were
24  both a Vivint campaign and a Blue Dolphin campaign?

Page 62

1    A.   Not that I'm aware of.
2    Q.   Did you find any instances in which more
3  than one campaign was listed for any single call?
4    A.   Not that I'm aware of.
5    Q.   So you can't tell me whether there were
6  -- whether the calls that are reflected as being
7  connected to a Vivint campaign are separate from
8  the calls in the Blue Dolphin campaigns, or if
9  there is any overlap?
10   A.   To my understanding they are separate
11  and distinct.
12   Q.   So I take it that you could not tell me
13  and that you do not have an opinion or conclusion
14  about whether any of the calls that are identified
15  as being connected to Blue Dolphin are also in some
16  way connected to Vivint?
17   A.   I do not know if there is a connection.
18   Q.   Or vice versa?
19   A.   Correct.
20   Q.   If we looked at the list of 190,298
21  calls that you identify in Paragraph 25-A as being
22  connected to Blue Dolphin, we would not be able to
23  pick from those calls any calls that were related
24  to Vivint; is that correct?

Page 63

1    MR. BRODERICK:  Objection.
2  BY MR. CUNNINGHAM:
3    Q.   I am sorry.  Your answer?
4    A.   That's my understanding.
5    Q.   And vice versa, if we look at Paragraph
6  25-B, the calls related to Vivint, you have
7  identified 137,512 connected calls to unique
8  numbers that were cell phone numbers that have the
9  description Vivint campaign next to them.
10       You couldn't tell me if any of those
11  calls have any connection to Blue Dolphin; is that
12  correct?
13   MR. BRODERICK:  Objection.
14  BY THE WITNESS:
15   A.   Correct.
16  BY MR. CUNNINGHAM:
17   Q.   Sorry.  That was a long and convoluted
18  question, but I think that you understood it.
19       Have you been asked by anyone to
20  determine whether or not you can ascertain the
21  individuals who would be included in any class of
22  people related to this litigation?
23   A.   I was not.
24   Q.   And you weren't asked to try to identify

Page 64

1  any people within any particular class?
2    A.   Not at this time.
3    Q.   Why did you -- or what is your
4  understanding of why you were asked to de-dup these
5  records so that you were reporting only unique
6  telephone numbers?
7    A.   I have no particular explanation why we
8  were asked to do it.  I was just performing a set
9  of services I was asked to perform.
10   Q.   Don't take this question the wrong way,
11  but is there something unique or special about what
12  you do that is different from what I might do
13  myself with an Excel spreadsheet to determine these
14  results?
15   A.   Yes.
16   Q.   What is that?
17   A.   As a company that specializes in TCPA
18  data management, we have systems that are able to
19  handle tens or millions of records.  I don't think
20  that you can do data manipulation in a spreadsheet.
21   Q.   Okay.
22   A.   Also probably a layperson would not be
23  able to know how to standardize and duplicate the
24  records correctly, how to produce reports and how



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
65–68

Page 65

1 to append certain information that was required in
2 this case.
3    Q.    Okay.  Anything else?
4    A.    That's it.
5    Q.    Okay.  Does the work that you performed
6 in this case require access to the proprietary
7 database that you described?  Is that part of the
8 reason why you need somebody with your expertise
9 and knowledge to do this work?
10    A.    That is correct.
11    Q.    Do you know what range of dates the
12 entire set of 25 spreadsheets that you were
13 provided covers?  I mean, we can see, obviously,
14 from this first page of the first spreadsheet that
15 there's a date column down the left-hand side, and
16 all of the dates in this column on this one page
17 are March 15, 2012.
18    A.    I did not specifically do this type of
19 analysis.
20    Q.    Do you know what the -- what the class
21 period is that the plaintiffs are attempting to
22 certify a class for in this case?
23    A.    No.  I do not know that.
24    Q.    That wasn't part of your task or your

Page 66

1 work in this case to try to identify information
2 related to any set period of time?
3    A.    That's correct.
4    Q.    Did plaintiffs' counsel provide you with
5 any information about how to interpret the data
6 shown on these spreadsheets, any kind of a key or a
7 list of what information is shown under each
8 column?
9    A.    Not that I recall.
10    Q.    Did you ask for any kind of a key or
11 list of these descriptions and what they mean?
12    A.    No, we did not.
13    Q.    Okay.  Are you familiar with the term
14 ANI, or the acronym ANI?
15    A.    I'm not.
16    Q.    Okay.  Let's take a look at the
17 spreadsheet, and we will kind of go column by
18 column, and I want to ask you what you know about
19 the information that's contained in each column
20 just generally; not about any specific record.
21        The first one is the date.  Do you have
22 any understanding of what information is shown in
23 that first column labelled, "Date"?
24    A.    Date.

Page 67

1    Q.    Yes?
2    A.    Date.
3    Q.    But the date of what?  Is it the date
4 that the record was made?  The date of the call?
5 The date that the record was input into this
6 spreadsheet?  The date that it was input into what
7 system generated the data that went into the
8 spreadsheet?  Do you have any knowledge of what
9 that date is?
10    A.    Our understanding is the date of the
11 phone call.
12    Q.    What is that understanding based on?
13    A.    Based on the prior experience in
14 analyzing these types of call logs.
15    Q.    What experience do you have analyzing
16 these types of phone logs?
17    A.    We have done -- A.B. Data has done work
18 on other TCPA cases where we have analyzed millions
19 of records in other TCPA cases, and the call logs
20 usually include the date and the time of the calls.
21    Q.    How many other TCPA cases have you done
22 work of this type in?
23    A.    Around 12.
24    Q.    Okay.  And at the end of your Affidavit

Page 68

1 you have your curriculum vitae, and that lists a
2 number of cases.  Are those cases listed in your
3 CV, those 12 cases?
4    A.    Yes, they are.
5    Q.    Can you point them out to me?
6    A.    I think in Paragraph 4 we talk about
7 several.
8    Q.    Okay.  Starting with Paragraph 4 of your
9 Affidavit you've listed three cases there?
10    A.    Correct.
11    Q.    These were all TCPA cases?
12    A.    That's correct.
13    Q.    And did you perform the type of call log
14 analysis in each of those three cases that you
15 performed in this case?
16    A.    Similar.
17    Q.    Did you prepare reports in each of those
18 three cases?
19    A.    We performed similar work in those
20 cases.
21    Q.    So you produced a similar affidavit
22 similar to the one that you produced in this case
23 in each of those three cases?
24    A.    Similar, yes.



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
69–72

Page 69

1    Q.   Okay.  And did you testify at a
2  deposition in each of those three cases?
3    A.   Yes, I did.
4    Q.   Is that deposition on more or less the
5  same kinds of topics and issues that we have been
6  talking about today?
7    A.   That's correct.
8    Q.   Did those lawyers ask better or worse
9  questions than me?
10   A.   Worse.
11   Q.   Good.  Thank you.  You are an excellent
12  witness.
13   A.   Thank you.
14   MR. JASZCZUK:  That was the right answer.
15  BY MR. CUNNINGHAM:
16   Q.   Have you testified in court at an
17  evidentiary hearing or a trial in any TCPA case?
18   A.   No, I have not.
19   Q.   Do you know whether your reports have
20  been used to support a motion for class
21  certification?  Not in support of a class
22  settlement but a contested motion for class
23  certification in any other TCPA case.
24   A.   I do not know.

Page 70

1    Q.   Okay.  Now, laying aside those three
2  cases, you said that there were approximately 12
3  that you think in which you have done work similar
4  to the work that you performed in this case.
5        If we look at the list of cases that's
6  attached to your CV, can you point out to me the
7  other cases?
8    A.   I can try.
9    Q.   All that I can ask you to do is to do
10  your best.
11   A.   DESI v. ADT.
12   Q.   That was an easy one.  I will give you
13  points for that.
14   A.   There are a lot of cases here.  I know
15  that I'm missing cases here.  Can I provide a list
16  to you at some point?
17   Q.   Of course.  Of course, and, obviously,
18  if there's any that you recall, tell me what those
19  are, but if it's the ones that are listed in
20  Paragraph 4 that we have talked about and the
21  DESI case, and there may be some additional ones
22  that you can provide later.
23   A.   There could be some additional ones.
24  They're here.  I just can't find them, but I

Page 71

1  will --
2    Q.   While we are on the topic of your
3  previous work in other cases, my understanding is
4  that in most of these cases your work was in
5  connection with class action settlements; is that
6  fair?
7        Let me ask it this way.  I will withdraw
8  that question, and I will ask you a slightly
9  different one.
10       Can you estimate for me the percentage
11  of your work that relates to a contested motion for
12  class certification as opposed to an agreed
13  settlement procedure where the plaintiff and the
14  defendant have agreed to settle a case and your
15  work relates to support for their agreement?
16   A.   I would say about 5 percent.
17   Q.   Okay.  5 percent contested?
18   A.   3 to 5 percent, yes.
19   Q.   Okay.  And this list of cases, it is a
20  very long list of cases, are these --  were you
21  personally involved in work in every single one of
22  these cases, or are these cases that were handled
23  by A.B. Data?
24   A.   I was personally involved in handling

Page 72

1  these cases.
2    Q.   Okay.  I'm not this -- this is not a
3  memory test, but I'm curious about -- if you look
4  on Page 7 of your list --
5    A.   Yes.
6    Q.   -- in the middle of the page there is a
7  case Parthiban v. GMAC Mortgage Corporation.
8    A.   Yes.
9    Q.   Do you recall that case?
10   A.   Vaguely.  Yes.
11   Q.   Do you recall what work that you
12  performed in connection with that case?
13   A.   Settlement work.
14   Q.   Nothing more specific than that?
15   A.   I really have to look through my records
16  to see exactly what work was performed to refresh
17  my memory.
18   Q.   That's a fair answer.  Fair answer.
19       Okay.  Let's go back to Exhibit 111-A
20  then, the big 11-by-17 blowup of the spreadsheet.
21  Let me ask you about the next column.  It says,
22  "Time."  Do you know what information is set forth
23  in that second column labelled, "Time"?
24   A.   Time of call.



Page 73

1    Q.   Okay.  Is it possible that the time
2  that's reflected here is the time that the record
3  was created rather than the time of the call
4  itself?
5    A.   That is not our understanding.
6    Q.   What is your understanding based on?
7    A.   I don't recall how I arrived to that
8  understanding.
9    Q.   Okay.  The third column is labelled,
10  "DNIS."  Do you know what DNIS stands for?
11    A.   No, I do not.
12    Q.   Do you know or have an understanding --
13  let me ask both questions.
14        First, do you know what information is
15  reflected in this DNIS column?
16    A.   No, I do not.
17    Q.   Okay.  Do you have any understanding of
18  what that information is?
19    A.   No, I do not.
20    Q.   Okay.  The next column is labelled,
21  "ANI," and I believe I already asked you if you are
22  familiar with that acronym, ANI, and you told me
23  that I am not; is that correct?
24    A.   I am not.

Page 74

1    Q.   Okay.  Do you know what information is
2  being reported under this column labelled, "ANI"?
3    A.   No, I do not.
4    Q.   And do you have any understanding of
5  what that information is?
6    A.   No, I do not.
7    Q.   Okay.  The next column to the right is,
8  "Call Type."  Do you know what information is
9  reflected in the Call Type column?
10    A.   That it's an outbound call.
11    Q.   As opposed to an inbound call?
12    A.   That's correct.
13    Q.   Do you know whether there were any
14  inbound calls listed on any of these 25
15  spreadsheets?
16    A.   Not that I'm aware of.
17    Q.   I noticed in my review of these
18  spreadsheets, it's not reflected on this first page
19  of this first spreadsheet, but sometimes in that
20  column we see the word "agent."
21        Do you have any understanding for what a
22  call that has the word "agent" in the call type
23  means?
24    A.   No.

Page 75

1    Q.   Okay.  The next column to the right is
2  labelled, "Duration."  Do you see that?
3    A.   Yes.
4    Q.   Do you know what information is
5  contained in that column?
6    A.   Duration of a phone call.
7    Q.   Okay.  And so what is that knowledge or
8  understanding based upon?
9    A.   Information provided to us by
10  plaintiffs' counsel.
11    Q.   Okay.  They told you that that was the
12  duration of the call?
13    A.   Yes.
14    Q.   Okay.  And when we see a duration of
15  zero, do you draw any conclusion or make any --
16  strike that.
17        Do you know what it means when there's a
18  duration of zero reported?
19    A.   It is our understanding that the
20  duration of the call was zero.
21    Q.   Well, so does that mean that there was
22  no answer, or something else?
23    A.   It could mean a variety of things.
24  Either there was no answer or --

Page 76

1    Q.   Okay.
2    A.   -- or a wrong number or a fax machine.
3  I don't know.
4    Q.   Okay.  If we look to the next column,
5  it's labelled, "Hold Time."  What is your knowledge
6  or understanding of what information is contained
7  in the column labelled, "Hold Time"?
8    A.   I don't have any information or
9  knowledge.
10    Q.   And then the column next to that reads,
11  "Handle Time."  Do you have any knowledge or
12  information about what information -- how to
13  interpret the information in the column called,
14  "Handle Time"?
15    A.   No.
16    Q.   The next column is labelled,
17  "Disposition."  What is your understanding of what
18  information is being reported in the disposition
19  column?
20    A.   We did not perform data analysis on any
21  fields in that column.
22    Q.   So you have no knowledge or
23  understanding of what any of the various
24  dispositions are?



Page 77

1     A.    That's correct.
2     Q.    Okay.  The next column is the Campaign
3 column, which we have already talked a little bit
4 about.
5         Were you provided any kind of a key or
6 other information that would help you interpret the
7 information being reported in the Campaign column?
8     A.    No.
9     Q.    Did you ask for one?
10    A.    No.
11    Q.    Was an understanding of what the
12 information being reported in the Campaign column
13 was important to your work in this case?
14    A.    Yes.  We would direct it to search for
15 two separate and distinct keywords that were
16 included in that Campaign field.  One keyword was
17 Blue Dolphin and another one was Vivint.
18    Q.    And those words -- when the spreadsheets
19 were searched, did those words always appear in the
20 Campaign column, or did they appear anywhere else
21 in the spreadsheet?
22    A.    We only looked for those words in the
23 Campaign column.
24    Q.    Do you know how many different campaigns

Page 78

1 are reported in these 25 spreadsheets?
2     A.    I do not.
3     Q.    The next column is labelled, "Agent."
4 Do you know what information is being reported in
5 the Agent column?
6     A.    That is outside of the scope of the data
7 analysis.
8     Q.    Okay.  So you would have no knowledge or
9 understanding for why many of the calls, at least
10 on this first sample page, reflect none in the
11 Agent column, but some of them reflect what appears
12 to be some kind of a code, like T036C?
13    A.    That's correct.
14    Q.    The next column is labelled, "Rate."  Do
15 you have any understanding or knowledge for what
16 information is being reported in the Rate column?
17    A.    That is also outside of the scope of our
18 work.
19    Q.    So you don't know?
20    A.    That's correct.
21    Q.    The next column is labelled, "Bill
22 Time."  Do you have any knowledge or understanding
23 of what information is being reported in the Bill
24 Time column?

Page 79

1     A.    Outside of the scope of our work.  No
2 knowledge.
3     Q.    So no knowledge?
4     A.    No knowledge.
5     Q.    The next paragraph is, "Cost."  Do you
6 have any understanding or knowledge of what
7 information is being reported in the Cost column?
8     A.    No.
9     Q.    The next column is labelled, "No. 1,"
10 and do you have any knowledge or understanding of
11 the information being reported in the No. 1 column?
12    A.    That's the phone number.
13    Q.    The phone number of what?
14    A.    That we performed data analysis for the
15 phone number that was called.
16    Q.    So you're understanding or
17 interpretation of this data is that is a phone
18 number that was called?
19    A.    Correct.
20    Q.    Okay.  And then the next two columns
21 say, "No. 2" and "No. 3."  Do you have any
22 understanding or knowledge for why there would be
23 or wouldn't be a second or a third number in those
24 columns?

Page 80

1     A.    No.
2     Q.    Okay.  The next column -- the next two
3 columns set forth a first name and a last name.
4 What is your understanding of the information that
5 we are seeing in those two columns?
6     A.    Though it was outside of our scope of
7 work, it is our assumption that somehow these names
8 are associated with these numbers.
9     Q.    Are they the subscribers for the
10 service, the telephone service associated with
11 those numbers?
12    A.    I have no knowledge of that.
13    Q.    They might be?  They might not be?
14    A.    That's correct.
15    Q.    Okay.  And then next to the first and
16 last name we have -- let me withdraw that and come
17 back to the names first.
18        Did you do -- you said that it was
19 outside of the scope.  So I am assuming that you
20 did not do -- you did not undertake any analysis to
21 determine the relationship between any of these
22 names and any of these phone numbers; is that fair?
23    A.    That's correct.
24    Q.    Okay.  The next couple of columns we



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
81–84

Page 81

1  have -- well, first, we have a column called,
2  "Company," and in that column is typically a
3  number.  Do you have any understanding or knowledge
4  for what Company means?
5      A.   We do not as it was outside of our scope
6  of work.
7      Q.   Do you have any idea how many different
8  companies are listed in the Company column?
9      A.   No.  I have no knowledge on that.
10     Q.   Okay.  Then we have Street, City, State
11  and Zip.  Do you have any knowledge or information
12  about the information reported in those columns?
13     A.   It is our assumption that the address
14  somehow relates to the name and that it somehow
15  relates to the phone number, but it is outside of
16  the scope of our work, and we really have no
17  knowledge of that.
18     Q.   Okay.  Then there is a column next to
19  the Zip Code column that says, "Subject," which on
20  this particular page is blank the entire way down.
21          Do you have any knowledge of what
22  information this column is intended to hold?
23     A.   No.  I do not have any information.
24     Q.   Next to that we have a column labelled,

Page 82

1  "Customer," and on this particular sample page it's
2  blank for every single row with the exception of
3  one, which has a number in it.
4          Do you have any knowledge or
5  understanding of what information was to be
6  reported in the column labelled, "Customer"?
7      A.   No, I do not.
8      Q.   So you don't have any idea what this
9  No. 20299 means with respect to one of these
10  columns?
11     A.   I have no understanding of that.
12     Q.   Okay.  The next column is an e-mail.  It
13  appears to me to be a list of e-mail addresses.  Do
14  you have any knowledge or understanding of what
15  information was to be contained in the e-mail
16  column?
17     A.   E-mail addresses.
18     Q.   Are they -- is it your understanding
19  that those relate in some fashion to the people
20  whose names appear?
21     A.   It is a fair assumption.
22     Q.   Okay.  But you don't have any actual
23  knowledge of that?
24     A.   No, I don't.

Page 83

1      Q.   Okay.  Next to that there is a column
2  labelled, "Affiliate ID."  Do you see that?
3      A.   Yes, I do.
4      Q.   Do you have any understanding or
5  knowledge of what information was to be contained
6  in the Affiliate ID column?
7      A.   I do not.
8      Q.   The next column reads, "IP."  Do you
9  have any knowledge or understanding of what --
10  well, first of all, what IP means or what that
11  acronym stands for?
12     A.   Probably IP address, but I don't know
13  how and why it is here or how it relates to
14  anything as it was outside of the scope.
15     Q.   Do you have any particular knowledge or
16  expertise related to IP addresses?
17     A.   Not particular knowledge or expertise.
18     Q.   Okay.  So you would not be able to tell
19  me whether an IP address is necessarily associated
20  with a particular person or not?
21     A.   That's correct.
22     Q.   Okay.  Or a particular name or e-mail
23  address?
24     A.   That's correct.

Page 84

1      Q.   Okay.  The next column says, "DOB."  Do
2  you have any knowledge of what information was to
3  be reported in the DOB column?
4      A.   I can assume it's date of birth, but I
5  have no knowledge.
6      Q.   You don't know?
7      A.   No.
8      Q.   "Title" the same thing?
9      A.   The same thing.
10     Q.   "Gender" the same thing?
11     A.   No idea.
12     Q.   And "Comments."  Do you have any idea
13  what "Comments" were?
14     A.   No.
15     Q.   Okay.  I am going to ask you a couple of
16  questions about the NEXXA Group.  The first one is
17  pretty basic.  What is NEXXA Group, Incorporated?
18     A.   NEXXA Group is a data service provider.
19     Q.   And did you or plaintiffs' counsel
20  identify NEXXA as a data service provider that
21  might help you with your work in this case?
22     A.   A.B. Data identified NEXXA as a data
23  service provider.
24     Q.   How long have you done business with



Page 85

1 NEXXA Group?
2    A.   For several years.
3    Q.   What kinds of things do you regularly
4 use NEXXA Group for?
5    A.   Data processing.
6    Q.   Have you used NEXXA Group in the past to
7 identify cell phone numbers?
8    A.   Yes, we have.
9    Q.   How many times?
10   A.   I don't recall the exact number of
11 times.
12   Q.   Have you done that work in connection
13 with anything outside of the prior TCPA cases that
14 you told me that you have done similar analysis as
15 the work in this case in?
16   A.   No, we haven't.
17   Q.   Did that question make sense?
18   A.   Yes.
19   Q.   Okay.  And what about with respect to
20 checking numbers against the DNC Registry?  You
21 used NEXXA Group for that function in this case;
22 right?
23   A.   Correct.
24   Q.   And have you used NEXXA Group to check a

Page 86

1 list of numbers against the DNC Registry on other
2 occasions?
3    A.   Yes, we have.
4    Q.   And how many occasions?
5    A.   Two or three.
6    Q.   And was that always in connection with a
7 TCPA case in which you were doing work similar to
8 the work in this case?
9    A.   That's correct.
10   Q.   And do you believe those are the two or
11 three cases identified in Paragraph 4 of your
12 Affidavit?
13   A.   Yes, I do.
14   Q.   Do you believe any of the other cases --
15 strike that.
16        Did you do any kind of work similar to
17 the work in this case in the ADT case, the DESI vs.
18 ADT?
19   A.   Define "similar."
20   Q.   Well, first of all, did you do any
21 scrubbing of a list for cell phone numbers in the
22 DESI vs. ADT?
23   A.   I believe so.
24   Q.   And checking for numbers on the DNC

Page 87

1 list, did you do that in ADT?
2    A.   I'm not sure.
3    Q.   Okay.  If you did, would you have used
4 NEXXA Group for that?
5    A.   Probably.
6    Q.   Can you think of any other company that
7 does work similar to NEXXA Group that you might
8 have used in any other TCPA case?
9    A.   LexisNexis.
10   Q.   Why do you sometimes use LexisNexis and
11 sometimes NEXXA?
12   A.   Turnaround time.
13   Q.   Which one is faster?
14   A.   It depends on their workload.
15   Q.   Have you ever -- I think that I know the
16 answer to this question, because you told me that
17 you weren't sure whether any of your previous work
18 has been used to support a contested motion for
19 class certification; right?
20   A.   I'm not sure.
21   Q.   You are not sure.  So you can't tell me,
22 then, whether you have ever relied upon any
23 information provided by NEXXA Group in connection
24 with work related to a contested motion for class

Page 88

1 certification; is that true?
2    A.   That's correct.
3    Q.   Yes?
4    A.   Yes.
5    Q.   And similarly, you wouldn't be able to
6 tell me whether your work in any other case has
7 ever been accepted as admissible expert testimony
8 in any case involving a contested motion for class
9 certification; is that fair?
10   A.   Fair.
11   Q.   Who is your main contact at NEXXA Group
12 in relation to this case?
13   A.   As I mentioned earlier, I do not recall
14 the name of the person, but I would be happy to
15 provide that information.
16   Q.   Okay.  Do you know what date that you
17 provided NEXXA Group with the data to do the
18 checking against its databases?
19   A.   It was late August.
20   Q.   How long did it take them to perform
21 their work and report back to you?
22   A.   Less than a week.
23   Q.   Is it your understanding that NEXXA
24 Group utilized the date of each call from these



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
89—92

Page 89

1  spreadsheets to determine whether the phone numbers
2  were assigned to a cell phone on the date of each
3  of those calls?  Do you follow my question?
4      A.   That's correct.
5      Q.   Okay.  So they weren't checking for cell
6  phone numbers as of today.  They were making sure
7  that database checked for each date that's
8  reflected on this page?
9      A.   It's historical, yes.
10     Q.   And so if we re-ran that search today,
11  you would expect the results to be identical?
12     A.   If you rerun your search today against
13  today's cell phone numbers?
14     Q.   No, no, no.  If we did exactly what you
15  did in the end of August, if we did it again today,
16  the results wouldn't change?
17     A.   That's correct.
18     Q.   Because you're checking against
19  historical data which presumably doesn't change;
20  right?
21     A.   Correct.
22     Q.   Okay.  Are you familiar at all with
23  statistics related to the frequency with which
24  phone numbers turn over or are recycled?

Page 90

1      A.   I have read literature and various
2  reports on that; however, I do not recall the
3  numbers if you ask me to.
4      Q.   Okay.  But would you agree with me that
5  a number that today is assigned to me might be
6  assigned to someone else tomorrow?
7      A.   I can assume that is a possibility.
8      Q.   And would you agree that it's possible
9  that a telephone number that is a landline today
10  might be a cell phone tomorrow or vice versa?
11     A.   That's correct.
12     Q.   Do you believe the NEXXA database is
13  reliable?
14     A.   I believe that it is reliable.
15     Q.   Why do you believe that?
16     A.   NEXXA is a well established vendor used
17  by many different industries --
18     Q.   Anything else?
19     A.   -- with a proven track record.
20  Additionally, we have relied on NEXXA data in a
21  number of cases where the data had proven to be
22  accurate.
23     Q.   Are you familiar with any case in which
24  information derived from a NEXXA database was

Page 91

1  offered and accepted by a court in connection with
2  a contested motion for class certification?
3      A.   I'm not aware of that.
4      Q.   Do you know where the information in
5  NEXXA's database comes from?
6      A.   From the material that NEXXA provides on
7  their sources.  It comes from a variety of public
8  and proprietary data sources, but mainly from 411
9  directory assistance data source.  That's one of
10  their main public sources.
11     Q.   Now, do you have first-hand knowledge of
12  that?  Or are you telling me something that you
13  understand based on something that NEXXA told you?
14     A.   As I stated, this is the information
15  that is derived from NEXXA's marketing materials.
16     Q.   Okay.  You never worked for NEXXA
17  yourself?
18     A.   No, I have not.
19     Q.   And when you say "proprietary
20  databases," again, that would be a database that
21  NEXXA maintains itself and is not a publicly
22  available database; is that correct?
23     A.   That's correct.
24     Q.   So there would be no way for me, for

Page 92

1  example, to double-check NEXXA's work if they were
2  relying on a proprietary database; is that fair?
3      MR. BRODERICK:  Objection.
4  BY THE WITNESS:
5      A.   I wouldn't know.
6  BY MR. CUNNINGHAM:
7      Q.   Do you know anything at all about the
8  process used by NEXXA to verify the accuracy of
9  information contained in its proprietary databases?
10     A.   I do not have first-hand knowledge of
11  it.  I rely on their reputation.
12     Q.   What have people at NEXXA told you about
13  the process that they used to verify the accuracy
14  of their data?
15     A.   NEXXA marketing material as well as
16  their quality control representatives state that
17  all of their data goes through various
18  certification and audit processes to assure it's
19  accuracy.
20     Q.   Do you still have the marketing material
21  that you're referring to, or is that something
22  that's available online?  Or how would I see those
23  marketing materials?
24     A.   We can either provide you what we have



ANYA VERKHOVSKAYA                                    November 19, 2013
BENZION, ET AL. -vs- VIVANT                                      93—96

Page 93

1  been provided with, and part of it is available
2  online.
3      Q.   With respect to the 411 directory
4  databases that you referred to, do you know
5  specifically what publicly available databases
6  NEXXA uses to determine, for example, whether a
7  given telephone number is a cell phone number or a
8  landline?
9      A.   I'm not aware of their methodology of
10  determining which phone number is a cell phone
11  number and which one is a landline.
12      Q.   Okay.  And so you wouldn't be able to
13  tell me, for example, who put the information in
14  the database that NEXXA reviews to do its work; is
15  that fair?
16      A.   I do not have first-hand knowledge of
17  that.
18      Q.   Do you have an understanding of whether
19  that's information that is reported by cell phone
20  service providers like Verizon or Sprint, or if it
21  comes from some other place?
22      A.   I think it's a combination.
23      Q.   But you're not sure?
24      A.   Based on NEXXA's marketing material, it

Page 94

1  is a combination.
2      Q.   How were the results of NEXXA's work for
3  you reported to you?  Did they deliver to you
4  spreadsheets, verbal reports, raw data?  How did
5  they report back with results to you?
6      A.   They delivered to us spreadsheets.
7      Q.   On a CD?  Via an FTP site?  Or some
8  other way?
9      A.   I believe that it was done through -- my
10  understanding was that it was done through an FTP
11  site.
12      Q.   You didn't ask NEXXA to cross reference
13  the phone numbers that are recorded in the 25
14  spreadsheets that you provided with the names that
15  are provided in that spreadsheet?
16      A.   No, we did not.
17      Q.   Do you think that's something that NEXXA
18  could do?
19      A.   Yes.  We think that's something that
20  NEXXA could do.
21      Q.   Okay.  Just above Paragraph 24 in your
22  report you refer to Group 1.  You have identified
23  two separate groups in your report.  Group 1, which
24  I understand, are telephone numbers that are cell

Page 95

1  phone numbers -- unique cell phone numbers related
2  either to Blue Dolphin or Vivint respectively.
3      Is that a fair understanding or
4  description of what Group 1 consists of?
5      A.   Correct.
6      Q.   Okay.  Another way to put it would be
7  Group 1 consists of the names, addresses and phone
8  numbers shown on the 25 spreadsheets that you
9  reviewed that had the word Vivint or Blue Dolphin
10  connected to them in some way where the phone
11  number was also shown as being a cellular phone
12  number according to NEXXA.  Does that all hold
13  together?
14      A.   Yes.
15      Q.   Did you do anything to exclude numbers
16  that had been ported from a wire line or a landline
17  to wireless within 15 days of the call?
18      A.   Before or after?
19      Q.   Well, let's ask both questions.  First,
20  did you do that to check whether the number had
21  been ported from wire line to wireless 15 days or
22  fewer prior to the call?
23      A.   No, we did not.
24      Q.   Did you do anything to exclude numbers

Page 96

1  ported from wire line to wireless more than 15 days
2  after the call?
3      A.   No, we did not.
4      Q.   Strike that.  That was a bad question.
5      Within 15 days of the call?
6      A.   No, we did not.
7      Q.   Did plaintiffs' counsel ask you to
8  exclude such people?
9      A.   No, they did not.
10      Q.   Did they ask you whether that was
11  feasible?
12      A.   Not that I recall.
13      Q.   Okay.  So you have no opinion or
14  conclusion regarding whether people whose numbers
15  were ported from wire line to wireless 15 days
16  before or 15 days after the call are contained in
17  the spreadsheets that you reviewed; correct?
18      A.   Correct.
19      Q.   Okay.  And then the same questions with
20  respect to Group 2.  We haven't gotten to Group 2
21  yet, but if I were to ask you about excluding
22  people whose numbers were ported from wire line to
23  wireless within 15 days of the calls to the people
24  in Group 2, you didn't do that work; is that fair?



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013

97–100

Page 97

1    A.    Fair.
2    Q.    No one asked you to do that?
3    A.    That is my understanding.
4    Q.    Is it possible that the names that you
5    would attribute to the people in Group 1 would be
6    subscribers for the phone numbers shown in the 25
7    spreadsheets from which Group 1 was derived?
8    A.    Could you repeat that question?
9    Q.    Sure.  Is it possible that the names
10   that you would include in Group 1 would be the
11   subscribers for cell service related to the phone
12   numbers drawn from the 25 spreadsheets that you
13   used to create Group 1?
14   A.    We were not asked to do that.
15   Q.    I know, but I'm asking you whether it's
16   possible?
17   A.    Well, anything is possible.
18   Q.    Okay.  In Paragraph 26 you state that
19   the information in the spreadsheets that you
20   reviewed -- that if the information in the
21   spreadsheets did not contain a name, address or
22   other contact information, you would be able to
23   obtain that information using only the telephone
24   number called.  Do you see that?

Page 98

1    A.    That's correct.
2    Q.    Okay.  How would you do that?
3    A.    Through a process referred to as reverse
4    append, where based on the date and the phone
5    number you identify the individual who was the
6    subscriber of the plan at the time and his or her
7    address.
8    Q.    Do you have any knowledge or
9    understanding about whether a subscriber for cell
10   phone service would be a class member of the
11   classes that the plaintiff seeks to certify in this
12   case?
13   A.    That is outside of the scope of my work
14   in this case.
15   Q.    And, therefore, you do not know?
16   A.    That's correct.
17   Q.    In Paragraph 23 of your report you
18   state, "A.B. Data understands that in this lawsuit
19   two different categories of data exist that
20   identify phone numbers that are or were" -- you use
21   the word "owned by putative class members during
22   the proposed class period."
23         Do you see that?
24   A.    Uh-huh.

Page 99

1    Q.    What did you mean when you used the word
2    "owned"?
3    A.    That they were paying for in one way,
4    shape or form.
5    Q.    Would it be the subscriber or not
6    necessarily the subscriber?
7    A.    Not necessarily, but it could be a
8    subscriber.  It's very open.  We use very open
9    terminology here, because we don't have the
10   specifics.
11   Q.    Okay.  What do you mean when you say
12   "open"?
13   A.    Well, we say we're owned, because it
14   could be subscriber, it could be not a subscriber;
15   therefore, we are not sure.  So that's why we left
16   it open.
17   Q.    So who would you consider the owner of a
18   phone to be if the phone was on a family shared
19   plan where service is in the name of the head of
20   the household, but there may be three or four or
21   five phones that are carried by a spouse or
22   children?
23   A.    We have no opinion on the matter.
24   MR. BRODERICK:  Objection.

Page 100

1    BY MR. CUNNINGHAM:
2    Q.    I'm sorry?
3    A.    We have no opinion on the matter.
4    Q.    Okay.  So you don't have any opinion
5    about who the owner of such phones would be?
6    A.    We were not --
7    MR. BRODERICK:  Objection.
8    BY THE WITNESS:
9    A.    We were not asked to provide that
10   opinion.
11   BY MR. CUNNINGHAM:
12   Q.    Do you have any way of deriving from a
13   telephone number who an authorized user of a cell
14   phone is?
15   A.    We were not asked to provide that
16   information.
17   Q.    I know that you weren't asked, but I'm
18   asking.  Do you have any way to do that?
19   MR. BRODERICK:  Objection.
20   BY THE WITNESS:
21   A.    If we were asked to put together an
22   expert opinion on how to get it done, we could
23   probably provide an expert opinion on how to get it
24   done, but we wouldn't be able to do it on the spot.



Page 101

1  BY MR. CUNNINGHAM:
2      Q.   Can you tell me as you sit here today
3  how you might determine who the authorized user of
4  any given cell phone is?
5      MR. BRODERICK:  Objection.
6  BY THE WITNESS:
7      A.   No.  I can't do it on the spot.
8  BY MR. CUNNINGHAM:
9      Q.   What about phones that are owned by a
10 business as the subscriber but are carried by
11 employees?  Is there any way that you would be able
12 to tell if a phone for which service was subscribed
13 by a company -- strike that.
14      If we assume that a phone -- a cellular
15 service is subscribed for by a company, are you
16 able to determine who the individual is that
17 actually carries and uses that phone?
18     MR. BRODERICK:  Objection.
19 BY THE WITNESS:
20     A.   That was outside of the scope of the set
21 of services that we were asked to provide in this
22 particular project and our affidavit.
23 BY MR. CUNNINGHAM:
24     Q.   Do you think there is a way to do that?

Page 102

1      MR. BRODERICK:  Objection.
2  BY THE WITNESS:
3      A.   If we were asked to provide an expert
4  opinion on how to get it done, we could probably
5  provide that opinion.
6  BY MR. CUNNINGHAM:
7      Q.   Are you familiar with a federal program
8  colloquially known as Obama phone?  Have you ever
9  heard of that?
10     A.   No, I have not.
11     Q.   My understanding, and I have no
12 first-hand knowledge of this, but my understanding
13 is that there is a Federal program that provides
14 cell phones to financially disadvantaged people.
15      If we assume that's true, do you have
16 any -- do you think there is any way to determine
17 who the authorized user of such phones --
18 authorized users of such phones would be if the
19 government is the subscriber for that cell phone
20 service?
21     MR. BRODERICK:  Objection.
22 BY THE WITNESS:
23     A.   Without further research, we would not
24 be able to issue an opinion.

Page 103

1  BY MR. CUNNINGHAM:
2      Q.   Okay.  What about prepaid cell phones?
3  Are there cell phones that people can purchase
4  where they're already a prepaid service that isn't
5  associated with any individual name?
6      MR. BRODERICK:  Objection.
7  BY MR. CUNNINGHAM:
8      Q.   That you are aware of.
9      A.   As I said, that's outside of the scope
10 of my opinion at this time.
11     Q.   I understand.  So you don't know and
12 haven't been asked about whether you could identify
13 individuals who carry and use a prepaid cell phone?
14     A.   I have not been asked that question,
15 that's correct.
16     Q.   In Paragraph 27 of your report you talk
17 about creating a Records Database by using
18 information that you would obtain from NEXXA.  What
19 other sources of data other than NEXXA would go
20 into the Records Database that you describe in
21 Paragraph 27?
22     A.   Information received from plaintiffs'
23 counsel.
24     Q.   Okay.  What information would that be?

Page 104

1      A.   The 25 spreadsheets, the source data.
2      Q.   Okay.  Now, I just want to get a
3  clarification from you.  You say in Paragraph 27
4  that you would cross-reference the phone number
5  contacted against a database, which can be
6  populated to contain telephone numbers, names and
7  addresses of consumers during the proposed class
8  period.
9      That makes it sound like you haven't
10 actually created that database.  Have you actually
11 created the database -- what you describe as
12 capital R capital D Records Database, or are you
13 telling us that this is a database that you could
14 create if asked to do it?
15     A.   The database is created.  However, it
16 does not have the data.  The database has the
17 functionalities necessary to process millions of
18 records through the database.
19     Q.   Okay.  So if I understand what you are
20 telling me, the database exists, but it doesn't
21 have any data in it today?
22     A.   That's correct.
23     Q.   You could populate that database with
24 data if you were asked to do it?



Page 105

1    A.   That is correct.

2    Q.   But no one has asked you to do that yet?

3    A.   That is correct.

4    Q.   And so you haven't done it yet?

5    A.   That's correct.

6    Q.   So as of today there is no way that I

7 would be able to test the creation and population

8 of the data in that database, because there is no

9 data in that database?

10    A.   That is correct.

11    Q.   Now, it's a proprietary database; is

12 that correct?

13    A.   That is correct.

14    Q.   So will I have access, will the lawyers

15 for Vivint in this case have access to the capital

16 R capital D Records Database once it has been

17 created?

18    A.   What type of access?

19    Q.   Will we be able to use it and manipulate

20 it and see how it works and check its accuracy and

21 verify that it's complete?

22    MR. BRODERICK:  Objection.

23 BY THE WITNESS:

24    A.   It has never been done in the past.

Page 106

1 BY MR. CUNNINGHAM:

2    Q.   Okay.  You say in Paragraph 28 that the

3 data in the Records Database would be created by

4 using your word data sets that you would obtain

5 from third party vendors, from available public and

6 proprietary records and databases in order to

7 populate the Records Database with information.

8    What data sets are you referring to

9 here?

10    A.   Once we receive information from

11 plaintiffs' counsel, we pan that information with

12 data sets like identifiers, which phone numbers or

13 cell phone numbers, which cell phone numbers are on

14 the do-not-call list.

15    When those phone numbers appeared or

16 were registered in the Do-Not-Call Registry, those

17 data sets are going to be appended to the source

18 data in the Records Database to allow us to

19 manipulate the data and create the necessary

20 reports.

21    Q.   Is there any other data set other than

22 cell phone numbers and DNC Registry data that would

23 go into the Records Database or be appended to the

24 information that you're provided by plaintiffs'

Page 107

1 counsel?

2    A.   If we asked for more data, we could get

3 more data sets to append.

4    Q.   Have plaintiffs' counsel indicated to

5 you that they will want you to append any more data

6 other than whether or not a given telephone number

7 is a cell phone or not and whether or not it is

8 registered with the National DNC?

9    A.   That's correct.

10    Q.   That's all that they have asked you for?

11    A.   For now?

12    Q.   Correct.

13    A.   And to de-duplicate the records.

14    Q.   Okay.

15    A.   And to identify which campaign.

16    Q.   And so in populating the Records

17 Database, would you depend upon or rely upon NEXXA

18 to supply you with the information regarding cell

19 phones and DNC Registry?

20    A.   Correct.

21    Q.   Would you use LexisNexis for that data

22 or just NEXXA?

23    A.   We would determine at the time of the

24 project which vendor is the most beneficial to use

Page 108

1 for that particular project.

2    Q.   And how could we double-check the

3 accuracy of the information that vendor uses to

4 populate that database?

5    MR. BRODERICK:  Objection.

6 BY THE WITNESS:

7    A.   Probably hire your own experts to advise

8 you and consult you on how to do it.

9 BY MR. CUNNINGHAM:

10    Q.   How would the Records Database be

11 audited for accuracy?  And I know that you told me

12 about NEXXA, and what is in its marketing

13 materials.  Outside of that --

14    A.   Sure.

15    Q.   -- are you aware of anything else that

16 would be done to audit the Records Database for

17 accuracy?

18    A.   Absolutely.  We have a quality control,

19 quality assurance department, and they would make

20 sure that all of the records were imported

21 properly, and they would run all kinds of audit

22 reports to make sure that the data was appended

23 correctly.

24    Q.   And that would tell you that the data



Page 109

1  was appended in the way that NEXXA or LexisNexis
2  told you it should be appended, but would quality
3  control or quality assurance at AD Data do anything
4  to verify that the information that NEXXA was
5  providing you was itself correct?
6      A.  No.  We rely on their expertise.
7      Q.  Would the Records Database contain a
8  separate field for the subscriber for the cell
9  phone service from the actual user of the cell
10  phone in question?
11      MR. BRODERICK:  Objection.
12  BY THE WITNESS:
13      A.  We were not asked to provide that
14  service.
15  BY MR. CUNNINGHAM:
16      Q.  If we assume in this case that the
17  subscriber for the cell phone on which the calls at
18  issue were received is a woman name Pamela Brooks,
19  but the individual who used and carried that phone
20  everyday is a gentleman named Matthew Benzion, are
21  you aware of any publicly available or proprietary
22  database that we would be able to determine that
23  from?
24      MR. BRODERICK:  Objection.

Page 110

1  BY THE WITNESS:
2      A.  I have no opinion on that matter.  That
3  is outside of the scope of --
4  BY MR. CUNNINGHAM:
5      Q.  With all due respect, that wasn't my
6  question.  Are you aware of any database that would
7  contain that kind of information?
8      MR. BRODERICK:  Objection.
9  BY THE WITNESS:
10      A.  I have no opinion on this matter without
11  further research.
12  BY MR. CUNNINGHAM:
13      Q.  Okay.  As of today you are not aware of
14  any such database?
15      A.  As of today, I'm not.
16      Q.  Okay.  In Paragraph 29 you say that the
17  Records Database that you could create would
18  produce either a hit or a no hit for each phone
19  number in the database.
20          And as I understand what you are telling
21  me in your report, a hit would be a match between
22  the names and the source data, the 25 spreadsheets,
23  and the Records Database that you would create?
24      A.  That's correct.

Page 111

1      Q.  Okay.  And that hit, again, would not be
2  able to differentiate between an authorized user of
3  a phone versus a subscriber of a phone; is that
4  correct?
5      A.  I have no opinion on that.
6      MR. BRODERICK:  Objection.
7  BY THE WITNESS:
8      A.  Without further research.
9  BY MR. CUNNINGHAM:
10      Q.  What do you mean in this paragraph by a
11  full or partial name or address?
12      A.  Sometimes the address might be missing a
13  zip code or missing a city, or some other
14  information could be missing.
15      Q.  Okay.  And how would full or partial
16  information be verified?
17      A.  We are a subscriber to -- a licensee to
18  the United States Postal Service software where we
19  are able to take a partial address and standardize
20  it to append missing address parts to make a full
21  address.
22      Q.  And as I understand it, a no hit would
23  result if you are unable to match up information
24  from the Records Database with the source data; is

Page 112

1  that correct?
2      A.  That's correct.
3      Q.  Can you think of how or why that would
4  happen?  If the source of the information in the
5  Records Database is the source data, how could you
6  get a no hit?
7      A.  It means that the third-party vendor did
8  not have a name or an address registered to that
9  particular phone number for that particular time
10  for one reason or another.
11      Q.  So if a hypothetical individual was a
12  Verizon wireless subscriber and had an account on
13  which there were five phones and five telephone
14  numbers, in your description of a hit on any of the
15  five numbers in my account, the source data would
16  need to be my name and number as the subscriber; is
17  that correct?
18      MR. BRODERICK:  Objection.
19  BY THE WITNESS:
20      A.  Different telephone -- different phone
21  companies register it in different ways.  So I
22  can't make a generalized opinion statement.
23  BY MR. CUNNINGHAM:
24      Q.  Okay.  Are you aware of cell phone



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
113–116

Page 113

1  service companies that track who the actual user of
2  any given cell phone is versus who the financially
3  responsible party is for the cell phone service?
4      MR. BRODERICK:  Objection.
5  BY THE WITNESS:
6      A.   It is outside of the scope of my
7  testimony, and without further research I wouldn't
8  be able to issue an opinion.
9  BY MR. CUNNINGHAM:
10     Q.   Okay.  Similar question for the
11 hypothetical that we discussed earlier about an
12 employer that provides cellular telephones to its
13 employees.
14         If the employer is listed by the cell
15 phone service carrier as the subscriber and you
16 populate the Records Database with the employee's
17 name, would the system or the database produce a
18 hit or a no hit for that individual?
19     MR. BRODERICK:  Objection.
20 BY THE WITNESS:
21     A.   The Records Database provides a hit for
22 the phone number, not for an individual.
23 BY MR. CUNNINGHAM:
24     Q.   So it would be whatever the cell phone

Page 114

1  service provider had listed for whatever is
2  associated with that phone number?
3      MR. BRODERICK:  Objection.
4  BY MR. CUNNINGHAM:
5      Q.   Is that your understanding?
6      A.   It's an assumption.
7      Q.   Okay.  It's your understanding and
8  assumption, right?
9      A.   Correct.
10     MR. BRODERICK:  Objection.
11 BY MR. CUNNINGHAM:
12     Q.   In your description of a hit, are there
13 checks and balances for variables in the way that
14 the data is reported?
15         So, for example, the street Maple
16 Parkway might be spelled Maple Park space Way,
17 Maple Parkway all one word, or maybe it's
18 abbreviated Maple PKWY.  Would the database account
19 for those types of variances?
20     A.   Yes.
21     Q.   And those types of variances would not
22 result in a no hit?  You would presumably still get
23 a hit even if there was some kind of variance
24 there?

Page 115

1      A.   That is correct.
2      Q.   What about with names?  So you have
3  somebody named Robert who might be listed in one
4  place as Bob and another place as Rob.  Would the
5  data place account for those types of variances?
6      A.   Yes.
7      Q.   How does it account for those types of
8  variances?
9      A.   By a very complex logic that is built
10 into the database, and then when the logic fails
11 and there are suspected hits, they are reviewed
12 manually.
13     Q.   Do you have any estimate -- strike that.
14         Before I get to that, who designed the
15 proprietary database?
16     A.   It was designed in-house.  It was
17 developed by A.B. Data.  The system that you're
18 referring to is developed by a combination -- the
19 system that you're referring to to deal with names
20 and addresses is described by -- is designed by the
21 United States Postal Service and several licensees
22 to that product called United States -- NCOA and
23 NCOA Plus.
24     Q.   Okay.  So let me make sure that I

Page 116

1  understand what you're telling me.  I'm familiar
2  with the National Change of Address Database.
3  That's used commonly in most cases in connection
4  with class settlements, right?  You use it in
5  virtually every case?
6      A.   Correct.
7      Q.   Are you telling me that the proprietary
8  database that is referred to in your report as the
9  Records Database uses as one of its components the
10 National Change of Address Database?
11     A.   To standardize the addresses, yes.
12     Q.   So that's how the Records Database
13 eliminates Bob from Rob or --
14     A.   Correct.
15     Q.   -- resolves those kinds of conflicts?
16     A.   Yes.  And that's how it resolves address
17 conflicts as well.
18     Q.   Okay.  Do you have any estimate of the
19 accuracy of the hit versus no hit results -- can
20 you estimate the accuracy of hits versus no hits in
21 this case?  Do you have any estimate at all?
22     MR. BRODERICK:  Objection.
23 BY MR. CUNNINGHAM:
24     Q.   Let me withdraw that and ask a better



Page 117

1 question.
2       First question: Do you have any way of
3 estimating as you sit here today the percentage of
4 names in the database that you would create in this
5 case that would result in hits versus no hits?
6       MR. BRODERICK: Objection.
7 BY THE WITNESS:
8    A. We haven't done that work. So I have --
9 BY MR. CUNNINGHAM:
10    Q. No way of estimating?
11    A. -- no way of estimating it.
12    Q. In Paragraph 30 of your report you say,
13 "For each hit the Records Database will display the
14 name and address information that is available as
15 matched to the telephone number during the relevant
16 proposed class period as well as the following
17 additional information: Date since, meaning the
18 date since a given individual is known to be
19 associated with that telephone number, and date
20 reported, meaning the last known date that the
21 individual was associated with that telephone
22 number."
23       My question is: What do you -- what do
24 you mean when you say, "known to be associated with

Page 118

1 the phone number"?
2    A. As I stated before, different phone
3 companies register each phone number differently;
4 therefore, in some cases it could be a subscriber,
5 and in some cases it could be a user, and in some
6 cases it could be a business.
7    Q. Are there other sources of data other
8 than phone companies for individuals who would be
9 known to be associated with the phone number?
10    A. Yes, there are.
11    Q. And would those databases be used, to
12 the best of your knowledge, in determining what
13 individuals are known to be associated with a given
14 telephone number in creating the Records Database?
15    A. Yes, there could be.
16    Q. Can you tell me what those other sources
17 of data are other than the phone companies?
18    A. NEXXA and LexisNexis and other data
19 collectors use, in addition to public records,
20 proprietary lists that would be opt-in lists of
21 various cell phone users, utilities companies'
22 information, and other lists that are collected
23 through a variety of means that could include user
24 of various cell phone numbers.

Page 119

1    Q. Would associated include instances in
2 which someone has provided a different party's
3 phone number on a website or some kind of
4 application, such as a spouse, a relative, a
5 co-worker, or something along those lines?
6       MR. BRODERICK: Objection.
7 BY THE WITNESS:
8    A. I don't think so, because if that's the
9 case, that would be an indication of that.
10 BY MR. CUNNINGHAM:
11    Q. You mentioned in one of your previous
12 answers -- you mentioned something called an opt-in
13 list. What is an opt-in list?
14    A. A list where individuals allow the data
15 that they provide to be used for other reasons.
16    Q. In any of your previous work in any
17 cases, whether it was a contested matter or a
18 settlement, have you had occasion to work with
19 opt-in lists?
20    A. Those lists are part of much larger data
21 sets that we use to append and massage potential
22 class data.
23    Q. Where do those opt-in lists come from?
24    A. From a variety of proprietary sources,

Page 120

1 from list companies, companies that rent, buy and
2 sell data, including various data lists from data
3 collectors, companies like NEXXA, LexisNexis, and
4 many other companies.
5    Q. In your experience are the opt-in lists
6 that are purchased from those types of companies
7 reliable?
8       MR. BRODERICK: Objection.
9 BY MR. CUNNINGHAM:
10    Q. I am asking in your experience.
11    A. They are used by reliable vendors.
12    Q. And based on that, you can conclude
13 yourself that they are reliable?
14       MR. BRODERICK: Objection.
15 BY THE WITNESS:
16    A. That is correct.
17 BY MR. CUNNINGHAM:
18    Q. Do you know any of the companies that
19 rent, buy or sell opt-in lists? Do you know the
20 names of any of the companies?
21    A. There are lots of list companies out
22 there. A.B. Data owns one.
23    Q. A.D. Data is one?
24    A. Yes.



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
121–124

Page 121

1    Q.   You sell data?  I guess that's why you
2  have the word data in your name.
3    A.   Ta-da.
4    Q.   Have you ever heard of a company called
5  Opt-In Plus?
6    A.   No.
7    Q.   All right.  Let's look at Group 2.  We
8  are getting close to the end here.
9    My first question is:  Is Group 2 a
10 subset of Group 1, or is it completely
11 independently determined?
12   A.   I believe it is a matter of semantics.
13 It could be either.
14   Q.   Well, I guess my question to you is --
15 let me put it a different way.  Is it possible that
16 somebody could be a member of Group 2 but not be a
17 member of Group 1?
18   A.   No, I believe an individual who is a
19 member of Group 2 is a member of Group 1.
20   Q.   Okay.  Tell me how you identified
21 members of Group 2.
22   A.   We de-duplicated the call log that we
23 reference in Paragraph 22, and determined which
24 telephone numbers were contacted more than once in

Page 122

1  any 12-month period.
2    Q.   Okay.  Did you limit people in Group 2
3  to people -- to cell phones or not?
4    A.   Yes, we did.
5    Q.   You did.  So everybody in Group 2 the
6  phone numbers should be a cell phone number?
7    A.   That is correct.
8    Q.   And then the results of your searches
9  were output into the 25 spreadsheets that we talked
10 right at the beginning of your deposition that are
11 recorded in Paragraph 36; correct?
12   A.   That's correct.
13   Q.   And just for the record, casting no
14 aspirations here, we still have not seen these 25
15 spreadsheets.  You and I talked about it.  Like I
16 said, I'm not -- just put it on your list of things
17 --
18   MR. BRODERICK:  I think that Anthony put it on
19 to a -- he didn't put it on to a --
20   MR. CUNNINGHAM:  No, sir, I have not seen
21 them, and, obviously, we would like to look at
22 them.
23   MR. BRODERICK:  Sure.
24   MR. CUNNINGHAM:  And I know that you agreed to

Page 123

1  give them to me.  And so I'm just assuming that
2  it's just sort of on his To Do List and hasn't
3  gotten here yet.
4    MR. BRODERICK:  Right.
5    MR. CUNNINGHAM:  Let's go off the record a
6  second.
7        (WHEREUPON, a discussion was had
8        off the record.)
9  BY MR. CUNNINGHAM:
10   Q.   Okay.  So, once again, you have divided
11 your work with respect to Group 2 into Blue Dolphin
12 campaigns and Vivint campaigns, and I understand
13 that you first sorted or searched or both for calls
14 that were related to Blue Dolphin or used the word
15 Blue Dolphin in some way in the Campaign column,
16 that you then de-duplicated that data, or maybe you
17 de-duplicated first and then searched for Blue
18 Dolphin, and then, as I understand it, you had
19 NEXXA check what you call the Blue Dolphin Group 2
20 data against the National DNC Registry; is that
21 correct?
22   A.   That is correct.
23   Q.   Okay.  And the dates that you used for
24 checking the DNC Registry were what?  The date of

Page 124

1  the first call?  The date of the last call?  The
2  date of each call?
3    A.   The date of the first call.
4    Q.   Do numbers ever come off of the National
5  DNC Registry?
6    A.   I don't know the answer to that
7  question.
8    Q.   Okay.  Do you know what happens if a
9  phone number is assigned to one person and that
10 person registers the phone with the National DNC
11 Registry but the phone number is later reassigned
12 to a new person?  Do you know whether it remains in
13 the National DNC Registry?
14   A.   Well, when one registers a phone number
15 in a Do-Not-Call Registry, he or she will register
16 that phone number with a name.  It's not a
17 requirement, but in most instances the DNC Registry
18 has a name associated with a phone number and a
19 date.
20   Q.   Do you know whether the cell phone
21 service providers report to the National DNC
22 Registry the names of the individuals who are
23 subscribers for a given number so that the database
24 can be updated to reflect new addresses?



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
125–128

Page 125

1    A.   As far as I know, they do not.
2    Q.   They do not?
3    A.   Yes.
4    Q.   Would you agree that many cellular
5    numbers on the National DNC Registry as of January
6    31, 2012, are not likely to be associated with the
7    party that originally registered them?
8        MR. BRODERICK:  Objection.
9    BY THE WITNESS:
10   A.   I really would not have knowledge one
11   way or another.
12   BY MR. CUNNINGHAM:
13   Q.   Do you see that as having any bearing on
14   your work in this case?
15   A.   No, I do not.
16   Q.   So it wouldn't matter to you whether an
17   individual name is on the National DNC Registry,
18   only whether the number is on the National DNC
19   Registry; is that true?
20       MR. BRODERICK:  Objection.
21   BY THE WITNESS:
22   A.   We did a historical lookup.  So I don't
23   know how your question is relevant to the services
24   that we performed in this case.

Page 126

1    BY MR. CUNNINGHAM:
2    Q.   Okay.  So you don't see it as having any
3    bearing on your work in this case?
4        MR. BRODERICK:  Objection.
5    BY THE WITNESS:
6    A.   Correct.
7    BY MR. CUNNINGHAM:
8    Q.   If we assume that a given number was on
9    the National DNC Registry at the time that a call
10   was made to it, but the date of the call was within
11   15 days of that number being ported from a wire
12   line to a wireless line, I take it from your prior
13   answers your process would not account for that; is
14   that true?
15   A.   That's correct.
16   Q.   Why did you pick a date 60 days prior to
17   the date of the first calling in each case?
18   A.   That's what we were asked to do.
19   Q.   And you don't have any understanding for
20   why that date was selected?
21   A.   That's correct.
22   Q.   Since you don't know who actually made
23   the phone calls reflected in the 25 spreadsheets, I
24   take it that you don't know how often, whoever that

Page 127

1    person was, updated its records related to numbers
2    registered with the National DNC; is that true?
3        MR. BRODERICK:  Objection.
4    BY THE WITNESS:
5    A.   That is correct.  I have no knowledge of
6    that.
7    BY MR. CUNNINGHAM:
8    Q.   And you also similarly could not tell me
9    when or how often Vivint updates its records
10   regarding numbers that are registered with the
11   National DNC; is that fair?
12   A.   I don't have first-hand knowledge on
13   that.
14   Q.   You indicate that you found 334,064
15   numbers that are associated in some way with the
16   Blue Dolphin campaign that were on the National
17   DNC Registry for more than 60 days prior to the
18   first call.
19       And you refer to those in your report as
20   the Blue Dolphin DNC registered numbers.  Do you
21   know whether Mr. Benzion's number was included in
22   any of those calls?
23   A.   I'm not aware of that.
24   Q.   Okay.  Were you asked to check to see

Page 128

1    whether Mr. Benzion's number was included among any
2    of those calls?
3    A.   I was not.
4    Q.   So you don't know as you sit here today
5    whether Mr. Benzion would be included in Group 2;
6    is that correct?
7    A.   That is correct.
8    Q.   Do you know whether Mr. Benzion's
9    telephone number is registered with the National
10   DNC Registry?
11   A.   I do not know that.  I do not have
12   first-hand knowledge of that.
13   Q.   You indicate that only 250,920 of the
14   334,064 calls in the Blue Dolphin DNC registered
15   numbers were connected.
16       Why is that of consequence to you,
17   whether they were connected or not?
18   A.   That's the data analysis that we were
19   asked to perform.
20   Q.   So you did it because you were told to
21   do it.  You don't have an understanding of why
22   that's important?
23   A.   That's correct.
24   Q.   What criteria did you use to determine



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
129–132

Page 129

1 whether any given call was connected?
2    A.   More than zero seconds in duration.
3    Q.   Did you do any -- did you make any
4 effort to reconcile duration withhold time or
5 handle time or understand why those might differ?
6    A.   No.  Not that I'm aware of.
7    Q.   With respect to the calls in the Vivint
8 Group 2 data, I understand that you repeated the
9 same process that we just discussed with respect to
10 Blue Dolphin, but limited those calls to those
11 having a connection to a campaign that lists the
12 word "Vivint" in some fashion; is that correct?
13    A.   That's correct.
14    Q.   And with respect to Vivint, you used the
15 date of January 31, 2012, as the date on which you
16 selected to check the DNC Registry.  Why did you
17 choose that date?
18    A.   That's the date we were asked to.
19    Q.   You don't have any understanding of why
20 you were asked to use that date?
21    A.   That is correct.
22    Q.   Who asked you at plaintiffs' counsel to
23 use that date?
24    A.   I don't recall at this time.

Page 130

1    Q.   Were you asked to review or determine
2 whether any of the persons whose phone numbers are
3 set forth in the spreadsheets that you examined
4 consented to receive any of those calls?
5    A.   We were not asked to do that.
6    Q.   You asked you to determine whether any
7 of them had -- to use the term opt-in lists,
8 appeared on any opt-in lists?
9    A.   No.  We were not asked to do that.
10    Q.   Is that something that you think that
11 you could do if you were asked?
12    MR. BRODERICK:  Objection.
13 BY THE WITNESS:
14    A.   I don't know the answer to that question
15 without further research.
16 BY MR. CUNNINGHAM:
17    Q.   Okay.  But I take it as you sit here
18 today, then, you have no opinions or conclusions
19 regarding whether any of those individuals
20 consented to receive the calls reflected on the
21 spreadsheets?
22    A.   That's correct.
23    Q.   Is it your understanding that a person
24 whose name is registered with the National DNC

Page 131

1 Registry could, nevertheless, be lawfully called if
2 they opt in or consent to receive that call?
3    A.   I have no opinion.
4    MR. BRODERICK:  Objection.
5 BY THE WITNESS:
6    A.   I have no opinion on this matter.
7    MR. CUNNINGHAM:  Just for the sake of the
8 record, what's your objection based on?
9    MR. BRODERICK:  I think it calls for a legal
10 conclusion.
11    MR. CUNNINGHAM:  I agree.  I will sustain your
12 objection.
13    MR. BRODERICK:  Good.
14    MR. CUNNINGHAM:  Off the record for a second.
15        (WHEREUPON, a discussion was had off
16        the record.)
17 BY MR. CUNNINGHAM:
18    Q.   I want to talk a little bit about your
19 experience.  Okay.  We have already talked a little
20 bit about it so far, and I believe you have told
21 me, and correct me if I'm wrong, that you are not
22 aware of any other case in which your work has been
23 relied upon in connection with a contested motion
24 for class certification; is that correct?

Page 132

1    A.   I'm not aware.
2    Q.   Okay.  Have you ever testified at a
3 trial as opposed to a hearing on an approval of a
4 motion to approve a class settlement?
5    A.   In a class action case?
6    Q.   Okay.  We will limit it to a class
7 action case, yes.
8    A.   No, I have not.
9    Q.   Have you ever been offered as an expert
10 witness at a trial of any case?
11    A.   No, I have not.
12    Q.   And separating out from trial now
13 evidentiary hearings where there is some motion and
14 the court is taking evidence, have you ever
15 presented testimony at an evidentiary hearing as an
16 expert witness?
17    A.   No, I have not.
18    Q.   Okay.  How many cases have you worked on
19 in the past with Mr. Broderick?
20    A.   Four or five.
21    Q.   Okay.  And how about Matthew McCue,
22 M-c-c-C-u-e?
23    A.   The same approximately.
24    Q.   Mr. Alex Burke, B-u-r-k-e?



Page 133

1    A.    Maybe three or four.
2    Q.    Mr. Dan Marovitch, M-a-r-o-v-i-t-c-h?
3    A.    I'm not sure.
4    Q.    And Mr. Scott Owens?
5    A.    Maybe one or two.
6    Q.    How many of the cases that you told us
7    that you just counted for those gentlemen were
8    cases that overlapped, where you worked -- where
9    more than one of them was on the same case?
10   A.    Maybe 30 percent.
11   Q.    Three percent?
12   A.    30.
13   Q.    Three cases?
14   A.    Yeah.
15   Q.    Okay.  I was going to say that 3 percent
16   or four or five is going to be a fraction of a
17   case.
18   MR. JASZCZUK:  She said 30 percent.
19   BY THE WITNESS:
20   A.    Right, which is about --
21   BY MR. CUNNINGHAM:
22   Q.    Oh, I gotcha.
23         What training do you have in connection
24   with the interpretation of data related to

Page 134

1    telephone calls?
2    A.    Experience.  I don't have any specific
3    formal training.
4    Q.    Okay.  So no classes or any kind of
5    education that relates to the interpretation of
6    data related to the telephone calls?
7    A.    That's correct.
8    Q.    Do you have any specialized knowledge or
9    experience related to telephone systems?
10   A.    Yes, but it is limited to installation
11   and operation of call center systems required for
12   class action administration purposes.
13   Q.    Can you explain that to me?  When you
14   say the installation and creation of call centers
15   in connection with class action settlement
16   administration, are you talking about in a class
17   action settlement when you set up a 1-800 or a toll
18   free telephone number for class members to call and
19   get information or claim forms, et cetera?  Is that
20   what you're saying?
21   A.    Correct.  AB Data's Class Action
22   Administration Company owns, you know, its own call
23   center that receives calls from class members and
24   makes outbound calls to class members.

Page 135

1    Q.    Okay.  And is that a separate company
2    from A.B. Data, or is it like a division?
3    A.    It's a division.
4    Q.    Is there somebody that's in charge of
5    that division?
6    A.    Yes, there is.
7    Q.    What is his name?
8    A.    Anya Verkhovskaya.
9    Q.    Oh, okay.  And so not to beat a dead
10   horse about the statement in your report about the
11   use of an automatic telephone dialing system -- if
12   I could find the paragraph.
13         Paragraph 23 where you say that you
14   understand that these calls were made with the use
15   of automated dialing equipment, who wrote that in
16   this report?  Not the drafts.  I understand and
17   appreciate Mr. Broderick's objection to my question
18   about --
19   A.    I did.
20   Q.    So that came from you?
21   A.    Yes.
22   Q.    And do you have any specialized
23   knowledge or experience related to telemarketing?
24   A.    No, I do not.

Page 136

1    Q.    Okay.  You never worked for a
2    telemarketing company?
3    A.    At some point A.B. Data, for the matter
4    of full disclosure, owned a telemarketing company,
5    but it was before my tenure with the company.
6    Q.    Okay.
7    A.    So the answer is no.
8    Q.    And you never worked -- okay.  Strike
9    that.
10         Have you received any formal training
11   with regard to the provision of class notice in
12   class action litigation?
13   A.    Not formal training.
14   Q.    All on the job?
15   A.    Correct.
16   Q.    Have you taken or taught any classes
17   dealing with class notice and class action
18   litigation?
19   A.    No.
20   Q.    Have you authored any publications
21   related to any of the topics that relate to your
22   work in this case?
23   A.    No.
24   Q.    Are you a member of any professional



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
137–140

Page 137

1 organization that relates in any way to the kind of
2 work that you did in this case?
3    A.   No.
4    Q.   Is it a fair characterization that the
5 qualifications that you believe you have to offer
6 expert testimony in this case are based on your
7 experience working at A.B. Data in the area of
8 class action settlement administration?
9    A.   Class action administration, yes.
10    Q.   Fair enough.  Do you know who Randall
11 Snyder, S-n-y-d-e-r, is?
12    A.   I do not recall.
13    Q.   You don't know whether you've ever
14 spoken with Mr. Snyder?
15    A.   I do not recall.
16    Q.   Do you know whether you have reviewed
17 any report prepared by Mr. Snyder in this case?
18    A.   I do not recall reviewing any reports
19 prepared by him.
20    MR. CUNNINGHAM:  Okay.  Off the record.
21       (WHEREUPON, a discussion was had off
22        the record.)
23    MR. CUNNINGHAM:  There are some things that we
24 need to follow up on.  I will send an e-mail to

Page 138

1 plaintiffs' counsel detailing a list of those
2 things that we need to follow up on.
3    I do not believe that I will have
4 further examination of this witness, but I do wish
5 to reserve my right, based on the additional
6 information we're provided, to reconvene this
7 deposition if after reviewing those items I have
8 additional questions.
9    Outside of that, I have no further
10 questions today for this witness.
11       EXAMINATION
12 BY MR. BRODERICK:
13    Q.   Okay.  I just have one area of
14 questioning about Group 1 versus Group 2.  I may
15 have not followed it clearly, but I think that it
16 was confusing, but is Group 2 in your Affidavit, in
17 fact, a subset of Group 1?
18    A.   I actually think that I misspoke.  I
19 actually think that Group 2 is separate and
20 distinct, and people can be Group 2 and not be part
21 of Group 1.
22    Q.   And, in fact, comparing Paragraph 25 of
23 your Affidavit, it says under Blue Dolphin that
24 627,929 calls were made to cellular telephone

Page 139

1 numbers, and comparing that with Paragraph 34 under
2 Blue Dolphin, subparagraph A, there were 632,274
3 telephone numbers that were called more than once
4 in the Blue Dolphin campaigns.
5    Does that indicate to you that there
6 were two separate analyses done of the same
7 spreadsheets?
8    A.   Correct, and I also referred that in
9 Paragraph 34 we reviewed files referenced in
10 Paragraph 22, which is a list of all files, and for
11 Group 1 in Paragraph 24, we separate the cellular
12 phone numbers.  So I did misspeak.
13    Q.   Okay.
14    A.   My apologies.  Thank you for clarifying.
15    MR. BRODERICK:  Nothing further.
16       FURTHER EXAMINATION
17 BY MR. CUNNINGHAM:
18    Q.   No problem, and I appreciate that
19 clarification.
20    Just so that I am perfectly clear,
21 Group 2 would then include some calls that were
22 made to landlines, not cell phones?
23    A.   That's correct.
24    MR. CUNNINGHAM:  Okay.  Understood.  All

Page 140

1 right.  That's it.
2    THE COURT REPORTER:  Signature?
3    MR. BRODERICK:  Sure, we will review and sign,
4 and I will take, you know, whatever your standard,
5 E-tran and Minuscript or all of that good stuff.
6       (WHEREUPON, the deposition was
7        concluded at 2:22 p.m.)



Page 141

```
1   STATE OF ILLINOIS   )
2                       )  SS:
3   COUNTY OF DU PAGE   )
4
5              I, NANCY A. GUIDOLIN, CSR No. 84-2531, a
6   Notary Public within and for the County of DuPage,
7   State of Illinois, and a Certified Shorthand
8   Reporter of said state, do hereby certify:
9              That previous to the commencement of the
10  examination of the witness, the witness was duly
11  sworn to testify the whole truth concerning the
12  matters herein;
13             That the foregoing deposition transcript
14  was reported stenographically by me, was thereafter
15  reduced to typewriting under my personal direction
16  and constitutes a true record of the testimony
17  given and the proceedings had;
18             That the said deposition was taken
19  before me at the time and place specified;
20             That I am not a relative or employee or
21  attorney or counsel, nor a relative or employee of
22  such attorney or counsel for any of the parties
23  hereto, nor interested directly or indirectly in
24  the outcome of this action.
```

Page 142

```
1              IN WITNESS WHEREOF, I do hereunto set my
2   hand of office at Chicago, Illinois, this 20th day
3   of November, 2013.
4
5
6              Nancy A. Guidolin
7
8              Notary Public,
9              DuPage County, Illinois.
10
11
12  NANCY A. GUIDOLIN, CSR No. 84-2531
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 143

```
1                    I N D E X
2   WITNESS                          EXAMINATION
3   ANYA VERKHOVSKAYA
4       By Mr. Cunningham              3,139
5       By Mr. Broderick              138
6
7
8
9
10               E X H I B I T S
11  NUMBER                          MARKED FOR ID
12  DEFENDANT'S DEPOSITION EXHIBIT
13      EXHIBIT NO. 110               25
14      EXHIBIT NO. 111               33
15      EXHIBIT NO. 111-A             33
16
17
18
19
20
21
22
23
24
```

Page 144

```
1              DEPOSITION ERRATA SHEET
2
3
4   Our Assignment No. 45330
5   Case Caption: Matthew Benzion and Theodore Glaser
6   vs. Vivint, Inc.
7
8          DECLARATION UNDER PENALTY OF PERJURY
9          I declare under penalty of perjury that I
10  have read the entire transcript of my Deposition
11  taken in the captioned matter or the same has been
12  read to me, and the same is true and accurate, save
13  and except for changes and/or corrections, if any,
14  as indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.
17
18          Signed on the _____day of
19  _____, 2013.
20
21
22  _____
23      ANYA VERKHOVSKAYA
24
```



ANYA VERKHOVSKAYA
BENZION, ET AL. -vs- VIVANT

November 19, 2013
145–146

---

Page 145

```
 1              DEPOSITION ERRATA SHEET
 2   Page No. ___ Line No. ___ Change to: _____
 3   _____
 4   Reason for change:_____
 5   Page No. ___ Line No. ___ Change to: _____
 6   _____
 7   Reason for change:_____
 8   Page No. ___ Line No. ___ Change to: _____
 9   _____
10   Reason for change:_____
11   Page No. ___ Line No. ___ Change to: _____
12   _____
13   Reason for change:_____
14   Page No. ___ Line No. ___ Change to: _____
15   _____
16   Reason for change:_____
17   Page No. ___ Line No. ___ Change to: _____
18   _____
19   Reason for change:_____
20   Page No. ___ Line No. ___ Change to: _____
21   _____
22   Reason for change:_____
23   Page No. ___ Line No. ___ Change to: _____
24   _____
```

Page 146

```
 1   Reason for change:_____
 2   Page No. ___ Line No. ___ Change to: _____
 3   _____
 4   Reason for change:_____
 5   Page No. ___ Line No. ___ Change to: _____
 6   _____
 7   Reason for change:_____
 8   Page No. ___ Line No. ___ Change to: _____
 9   _____
10   Reason for change:_____
11   Page No. ___ Line No. ___ Change to: _____
12   _____
13   Reason for change:_____
14   Page No. ___ Line No. ___ Change to: _____
15   _____
16   Reason for change:_____
17   Page No. ___ Line No. ___ Change to: _____
18   _____
19   Reason for change:_____
20   Page No. ___ Line No. ___ Change to: _____
21   _____
22   Reason for change:_____
23   SIGNATURE:_____DATE:_____
24          ANYA VERKHOVSKAYA
```

